PROPPER, RECEIVER, *v.* CLARK, ATTORNEY GENERAL, AS SUCCESSOR TO THE ALIEN PROPERTY CUSTODIAN, ET AL.

No. 390.   Argued March 28–29, 1949.—Decided June 20, 1949.

*A. Walter Socolow* and *Joseph M. Cohen* argued the cause and filed a brief for petitioner.

*David Schwartz* argued the cause for Clark, Attorney General, respondent. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Bazelon, James L. Morrisson* and *Joseph Laufer.*

*Louis D. Frohlich* argued the cause and filed a brief for Deems Taylor, as President of the American Society of Composers, Authors and Publishers.

MR. JUSTICE REED delivered the opinion of the Court.

The Alien Property Custodian [1] on April 22, 1946, began this action under § 17 of the Trading with the Enemy Act in the United States District Court for the Southern District of New York to obtain the payment, and a declaration of title in him as against the petitioner as receiver, of certain royalties owed by the American Society of Composers, Authors and Publishers (ASCAP) to Staatlich Genehmigte Gesellschaft der Autoren, Komponisten und Musikverleger (AKM), an Austrian association, pursuant to the provisions of Vesting Order No. 2097, Office of Alien Property Custodian, September 4, 1943, 8 Fed. Reg. 16463, whereby the Custodian had vested in himself title to certain property of AKM, specifically claims for royalties under copyrights for the performance of musical compositions. By contract ASCAP had been authorized by AKM to license on royalty the use in this country of musical copyrights belonging to AKM. ASCAP and the petitioner, who is the state-appointed receiver of the royalties involved, were made defendants. The District Court, on motion for summary judgment or judgment on the pleadings, entered a judgment declaring

---

[1] Tom C. Clark, Attorney General, was duly substituted as Successor to the Alien Property Custodian.

that the petitioner had no right, title or interest in the claim in question, *Markham* v. *Taylor*, 70 F. Supp. 202, and later, a second judgment directing ASCAP to pay the debt to the Custodian. The United States Court of Appeals for the Second Circuit, on appeal by the petitioner,[2] affirmed. *Clark* v. *Propper*, 169 F. 2d 324.

The pertinent facts underlying this controversy are as follows: On June 12, 1941, on an *ex parte* application by a creditor of AKM, the New York Supreme Court appointed petitioner temporary receiver of that association, pursuant to § 977–b of the New York Civil Practice Act, which provides for the liquidation of the local assets of a foreign corporation when it has ceased to do business for one reason or another not here important. Proceedings under this Act are to enable claimants against the foreign corporation to secure payment of their claims by an equitable apportionment of the available assets. The order of appointment directed him "to take, receive and reduce to his possession any and all assets . . . tangible and intangible, within the State of New York, of the defendant [AKM], and hold the same until the further order of this Court." On June 14, 1941, pursuant to § 5 (b) of the Trading with the Enemy Act of 1917, 40 Stat. 411, 415, as amended,[3] the President promulgated Executive Order No. 8785,[4] a so-called "freezing order," which prohibited certain transactions involving Austrian property except as they were specifically licensed by the Secretary of the Treasury. On July 29, 1941, petitioner, as receiver, began an action in the courts of New

---

[2] ASCAP, having stipulated to the entry of a judgment against it, did not appeal. It filed a motion here to be made a party. It was permitted to argue and there is now no occasion to grant the motion. It is denied.

[3] By the Joint Resolution of May 7, 1940, 54 Stat. 179.

[4] 6 Fed. Reg. 2897.

York against ASCAP to recover the royalties which it owed AKM.[5] Its disposition is awaiting the outcome of this case. On September 29, 1941, petitioner, upon the default of AKM, was appointed permanent receiver of that association's assets. Thereafter followed the vesting order, September 4, 1943, and this suit, April 22, 1946.

Upon the limited grant of the petition for certiorari, 335 U. S. 902, the issues argued before this Court and now to be decided are whether the appointment of petitioner as temporary receiver on June 12, 1941, or his appointment as permanent receiver on September 29, 1941, by relation back, passed title to him of the claim for royalties as of June 12, 1941. Furthermore, since, as will subsequently appear, we conclude these issues against petitioner, we must consider whether the freezing order barred a subsequent unlicensed judicial transfer by the order appointing the petitioner permanent receiver.[6]

*First.* The appointment as permanent receiver on September 29, 1941, concededly would have vested in petitioner as permanent receiver all right, title and interest of AKM in its claim against ASCAP if the freezing order of June 14, 1941, had not intervened after petitioner's appointment as temporary receiver on June 12, 1941.

---

[5] For opinions of the New York courts relating to the petitioner's action against ASCAP, see *Propper* v. *Buck,* 106 N. Y. Law Journal, No. 101, October 29, 1941, p. 1268, col. 5; *Propper* v. *Buck,* 263 App. Div. 807, 32 N. Y. S. 2d 103 (1st Dept.); *Propper* v. *Buck,* 178 Misc. 76, 33 N. Y. S. 2d 11 (Sup. Ct. N. Y. Co.), affirmed, 263 App. Div. 948, 34 N. Y. S. 2d 134; *Propper* v. *Taylor,* 186 Misc. 70, 58 N. Y. S. 2d 829 (Sup. Ct. N. Y. Co.), affirmed, 270 App. Div. 890, 62 N. Y. S. 2d 602 (1st Dept.); *Propper* v. *Taylor,* 186 Misc. 72, 58 N. Y. S. 2d 831 (Sup. Ct. N. Y. Co.), modified, 270 App. Div. 890, 62 N. Y. S. 2d 601 (1st Dept.).

[6] This latter issue was brought forward by the petition for certiorari, Question Presented No. 3, and before argument its discussion by brief and at the bar was formally requested by this Court, although no order to that effect was entered.

Accepting that position, the question of whether the appointment as permanent receiver related back to the date of the temporary receivership, so as to place title to the claim in the permanent receiver as of June 12, 1941, and the question as to whether the appointment as permanent receiver itself vested title in the petitioner, notwithstanding the prior freezing order, depend alike upon a determination as to whether the freezing order made invalid any subsequent transfer of title by judicial action.

The vesting order here in question, Vesting Order No. 2097, 8 Fed. Reg. 16463, was executed on September 4, 1943, a date subsequent to the appointment of petitioner as permanent receiver. So far as the parties to this litigation are concerned, by its specific terms it vested in the Custodian title to the property of AKM only.[7] Nothing presented in this case calls our attention to any effort made by the Custodian to vest in himself any title to the claim that might be in the permanent receiver for the benefit of creditors and ultimately for AKM or those entitled to its assets on distribution,[8] nor do we adjudicate

---

[7] See Trading with the Enemy Act, 50 U. S. C. App. §§ 7 (c) and 616:

"§ 616. . . . . and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; . . . ."

See *Clark* v. *Uebersee Finanz-Korp.*, 332 U. S. 480.

[8] Compare *Great Northern R. Co.* v. *Sutherland*, 273 U. S. 182, where the Custodian vested in himself by order on a corporation the shares of stock appearing on the corporation's books in the name of an alien enemy.

It may be that all property subject to blocking may not be sub-

his right to do so. The order, so far as pertinent, vested in the Custodian "All . . . claim [of AKM to] all right to receive monies . . . by way of royalty, share of profits or other emolument," together with "all causes of action . . . with respect to" the aforesaid copyrights. This claim was a debt of ASCAP to AKM, property of AKM, as defined in the regulations of April 10, 1940, 5 Fed. Reg. 1401 (c), and June 14, 1941, 6 Fed. Reg. 2905. The latter citation refers to the regulation defining property, under the Trading with the Enemy Act, effective at the time of the vesting order.[9]

Prior to petitioner's appointment as permanent receiver and the later vesting order, the President, on June 14, 1941, had prescribed by Executive Order No. 8785, 6 Fed. Reg. 2897, that certain transactions by or on behalf of Austrian associations such as AKM were prohibited unless licensed. No license for the judicial order appointing petitioner as permanent receiver was asked for or obtained.

Order No. 8785 was issued pursuant to the authority granted the President by § 5 (b) of the Act of October 6, 1917, as amended, particularly by the Joint Resolution of May 7, 1940.[10] Th order forbade, § 1A, "All transfers of credit between any banking institutions within the United States; . . . ." Authority during war

---

ject to vesting. Trading with the Enemy Act, as amended by First War Powers Act, 55 Stat. 838, 839, Title III (1) (B). Compare Bishop, Judicial Construction of the Trading with the Enemy Act, 62 Harv. L. Rev. 721, 723.

[9] 55 Stat. 838, 840, 50 U. S. C. App. § 617.

[10] 54 Stat. 179:

"During time of war or during any other period of national emergency declared by the President, the President may, through any agency that he may designate, or otherwise, investigate, regulate, or prohibit, under such rules and regulations as he may prescribe, by means of licenses or otherwise, any transactions in foreign exchange, transfers of credit between or payments by or to banking institutions as defined by the President, . . . ."

or any other period of national emergency to prohibit such transfers was given the President by the Joint Resolution. Order No. 8785 declared "the existence of a period of unlimited national emergency."

The same Resolution authorized the President to issue rules and regulations and specifically to define "banking institutions." The President had on April 10, 1940, issued a similar order prohibiting similar transfers applicable to nationals of Norway and Denmark to guard against such transfers brought about by the German invasion of those countries. Executive Order No. 8389, 5 Fed. Reg. 1400. It contained to all intents and purposes the same definition of "banking institutions." See § 11 C thereof. The order and regulations thereunder, and therefore the definition, were approved by the Joint Resolution.[11] The definition applicable to transactions of this Austrian national, AKM, under the freezing order of June 14, 1941, is set out below.[12] We accept this definition as authorized by the Resolution.

By the order appointing a permanent receiver, the claim of AKM against ASCAP was directed to be transferred from AKM to the petitioner. From ASCAP's point of view it was a debt; from AKM's a claim. The shift of obligation contemplated by the order for a per-

---

[11] 54 Stat. 179:

"Sec. 2. Executive Order Numbered 8389 of April 10, 1940, and the regulations and general rulings issued thereunder by the Secretary of the Treasury are hereby approved and confirmed."

[12] 6 Fed. Reg. 2898, § 5:

"F. The term 'banking institution' as used in this Order shall include any person engaged primarily or incidentally in the business of banking, of granting or transferring credits, or of purchasing or selling foreign exchange or procuring purchasers and sellers thereof, as principal or agent, or any person holding credits for others as a direct or incidental part of his business, or brokers; and, each principal, agent, home office, branch or correspondent of any person so engaged shall be regarded as a separate 'banking institution.'"

manent receiver was a transaction that involved "property in which" there was an "interest of any nature whatsoever, direct or indirect," in aliens of designated countries, including Austria.[13] But the Executive Order of June 14, 1941, did not prohibit all transactions without license involving Austrian-owned property. It specified the prohibited transactions, however, by categories so all-inclusive as to make it clear that the purpose was to require transactions involving property of nationals of designated foreign countries to be carried out under regulations of this Government, except certain transactions such as are provided for in General Ruling No. 12, April 21, 1942, 7 Fed. Reg. 2991. The Executive Order forbids transfers of credit. As "credit" is not defined by the Order or regulation, we, in considering credits as property subject to vesting under the Trading with the Enemy Act, give it its ordinary meaning of the obligation due on accounting between parties to transactions. This credit, owed by ASCAP to AKM, was in effect directed to be transferred by the permanent receiver order from AKM to the petitioner as receiver. There is, we think, no doubt that a voluntary transfer by a bank of a credit in the transferring bank from the account of a known Austrian to the account of another banking institution would violate Executive Order No. 8785 as a transfer of credit between banking institutions.

It remains, then, to determine whether ASCAP and petitioner are banking institutions of such a character as to be subject to the prohibition of Executive Order No. 8785, § 1 A against "transfers of credit between any banking institutions." A reading of the President's definition, note 12 *supra,* shows that they do fall within the words "any person holding credits for others as a direct or incidental part of his business . . . ." It is true that

---

[13] Executive Order No. 8785, *supra.*

to make ASCAP or the petitioner a banking institution by definition is a departure from the ordinary conception of the meaning of "banking institution." Petitioner says to so construe the definition is "utter fantasy." The definition, however, as we have pointed out, has had congressional ratification. Furthermore, the obvious intention of Congress to allow flexibility in the term "banking institution" by leaving its definition to the President sheds light on its purpose. The phrase "banking institution" used and defined in the Bank Holiday Proclamation of March 6, 1933, 48 Stat. 1689, 1690, was adopted by the Emergency Banking Relief Act of March 9, 1933, 48 Stat. 1, with a delegation to the President of the power of definition. Evidently the delegation was to permit him to bring atypical forms of financial institutions within the reach of the emergency act. The Act of March 9 was grafted on to the Trading with the Enemy Act of 1917 and, when that Act was again extended to meet the foreign assets problem, the President's wide power to define "banking institution" was a ready instrument to cope with the myriad circumstances arising in the control of shifts of foreign assets. The power in peace and in war must be given generous scope to accomplish its purpose. Through the Trading with the Enemy Act, in its various forms, the nation sought to deprive enemies, actual or potential, of the opportunity to secure advantages to themselves or to perpetrate wrongs against the United States or its citizens through the use of assets that happened to be in this country.[14] To do so has necessitated some inconvenience to our citizens and others who, as here, are not involved in any actions adverse to the nation's interest. That fact, however, cannot lead

---

[14] See United States Treasury Department, *Administration of the Wartime Financial & Property Controls of the United States Government* (1942), pp. 1–4.

us to narrow the broad coverage of the Executive Order. Our prior decisions have made that clear.[15]  ASCAP and petitioner, the receiver, each hold credits for others as an "incidental part of [their] business," and are therefore "banking institutions."  ASCAP held a credit for AKM and, after the permanent receivership order, would hold that credit for the receiver, who in turn would hold it for AKM's creditors and AKM.

We hold that a transfer of this credit from a liability owed by ASCAP to AKM, to a liability owed by ASCAP to the receiver, would violate the prohibition against transfers of credit.

We turn now to an examination of the effect of the federal Executive Order No. 8785 of June 14, 1941, the so-called "freezing order," on the subsequent state court order of September 29, 1941, appointing the petitioner permanent receiver.  That examination is to be made with recognition of the fact that, at the time of the state order, title to the AKM claim against ASCAP had not been vested in the Custodian.  That development did not take place until the vesting order of September 4, 1943.

It is petitioner's contention that a mere freezing order does not prohibit a subsequent judicial order transferring title to blocked assets covered by the previous freezing order.  We will deal subsequently in this opinion with the question of whether the title to the claim passed to the temporary receiver, under New York law, on his appointment.  At this point, we assume this did not happen and examine only the question of the effect of a freezing order on the subsequent judicial order.  Petitioner's argument is that such a construction would immobilize frozen property until it suits the Custodian's convenience

---

[15] *Central Trust Co.* v. *Garvan*, 254 U. S. 554; *United States* v. *Chemical Foundation*, 272 U. S. 1; *Great Northern R. Co.* v. *Sutherland*, 273 U. S. 182; *Markham* v. *Allen*, 326 U. S. 490; *Clark* v. *Uebersee Finanz-Korp.*, 332 U. S. 480.

to vest, contrary to the need for protection against transfers of foreign funds. These needs, petitioner says, will be served by the provision against payments to claimants from frozen funds without a license. E. O. 8785, § 1B.[16] He further argues that by the Joint Resolution Congress did not empower the President to deprive New York of all power to deal with the ASCAP debt in a proceeding under Civil Practice Act § 977–b, covering actions of receivers to liquidate local assets of defunct foreign corporations.

It is true that state litigation between local claimants and foreign owners or those in possession of blocked or frozen assets could proceed to a determination of rights between the claimant and the foreign national without the blocked property passing into hands that might use it to the detriment of the welfare of this nation, so long as payment could not be made without a license. Nothing in the Trading with the Enemy Act or regulations specifically forbids eo nomine litigation in state courts. The plan for prohibition of unlicensed transactions by foreign nationals comprehends blocking of transfers of credits and vesting of local assets of such nationals under the Trading with the Enemy Act and regulations thereunder. If transactions are blocked, vesting may or may not follow. When the Custodian vests blocked property, title passes to the Custodian and his authority to vest

---

[16] There is a suggestion that Congress could not, because of the Tenth Amendment, constitutionally abrogate the power of New York through its courts, in peacetime, to deal with the local assets of defunct foreign corporations. The chief reliance is placed upon *Clark* v. *Williard*, 294 U. S. 211, a case that held that, as between states, the state of the location of corporate assets had control of their distribution in liquidation. It cannot be seriously doubted that the danger of war was sufficiently grave at the time of the freezing order, June 14, 1941, to justify the President's action respecting Austrian property. Cf. *Silesian-American Corp.* v. *Clark*, 332 U. S. 469, 474–477.

and hold cannot be questioned except as provided in the Trading with the Enemy Act.[17] The freezing order of June 14, 1941, immobilized the assets covered by its terms so that title to them might not shift from person to person, except by license, until the Government could determine whether those assets were needed for prosecution of the threatened war or to compensate our citizens or ourselves for the damages done by the governments of the nationals affected. *United States* v. *Chemical Foundation,* 272 U. S. 1, 11; *Silesian-American Corp.* v. *Clark,* 332 U. S. 469, 476.

We assume that the Court of Appeals of New York held in *Singer* v. *Yokohama Specie Bank* that title to blocked assets could pass without license from a statutory receiver to a creditor.[18] As the Trading with the Enemy Act is federal legislation founded on federal constitutional provisions, however, the United States has authority to make all laws necessary and proper for carrying the power into execution. The power to enact carries with it final authority to declare the meaning of the legislation. *Prudence Corp.* v. *Geist,* 316 U. S. 89, 95. Federal

---

[17] 50 U. S. C. App. §§ 7 (c), 9 (a). Cf. *Clark* v. *Uebersee Finanz-Korp.,* 332 U. S. 480, 487; *Central Trust Co.* v. *Garvan,* 254 U. S. 554, 567–68; *Great Northern R. Co.* v. *Sutherland,* 273 U. S. 182, 194; *Becker Co.* v. *Cummings,* 296 U. S. 74, 79; *Josephberg* v. *Markham,* 152 F. 2d 644, 649.

[18] 293 N. Y. 542, 550, 58 N. E. 2d 726, 728:

"The fact that Federal regulations governing transactions in foreign exchange prevent the payment to Standard until a license under Executive Order No. 8389, as amended, is procured does not make conditional the obligation of the New York Agency to pay. (See United States Treasury Department, General Ruling No. 12 (4) under Executive Order No. 8389 as amended; also *Feuchtwanger* v. *Central Hanover Bank,* 288 N. Y. 342.)"

Cf. *id.;* 121 N. Y. L. J., No. 95, May 16, 1949, p. 1735. Compare *Polish Relief Comm'n* v. *Banca N. A. Rumaniei,* 288 N. Y. 332, 43 N. E. 2d 345.

courts have so held as to this issue in this case, 169 F. 2d 324, 327, and in *Bernstein* v. *N. V. Nederlandsche-Amerikaansche etc.,* 173 F. 2d 71, 73. The Trading with the Enemy Act is national in range. The effect of a federal freezing order should be the same on subsequent transfers of title in all states. State law determines the effect of the appointment of a receiver on title to the property administered, but federal law determines whether the event of appointment can free the property from the prior control. Cf. *Lyeth* v. *Hoey,* 305 U. S. 188, 191, *et seq.*

Petitioner contends also that the administrative interpretation of the Executive Order of June 14, 1941, has been to permit litigation as to rights in the frozen assets. That is borne out by General Ruling No. 12 of April 21, 1942, 7 Fed. Reg. 2991, promulgated after petitioner had begun his suit against ASCAP and referring to Executive Order No. 8389, as amended June 14, 1941. The applicable section is set out in the margin.[19] It is to be observed, however, that the proviso of § (d) limits the rights a litigant may obtain to such right as the owner of blocked property could confer by voluntary act. General Ruling No. 12, as it came after the suit by the receiver against ASCAP was started and after the order appointing petitioner as permanent receiver, is not treated by us as

---

[19] "(d) Any transfer affected by the Order and/or this general ruling and involved in, or arising out of, any action or proceeding in any Court within the United States shall, so far as affected by the Order and/or this general ruling, be valid and enforceable for the purpose of determining for the parties to the action or proceeding the rights and liabilities therein litigated; *Provided, however,* That no attachment, judgment, decree, lien, execution, garnishment, or other judicial process shall confer or create a greater right, power, or privilege with respect to, or interest in, any property in a blocked account than the owner of such property could create or confer by voluntary act prior to the issuance of an appropriate license."
See also Public Circular No. 31, August 2, 1946, 11 Fed. Reg. 8351.

decisive in this case. It is useful only as a statement of the administrative determination as to the effect of litigation without a license.

It is our conclusion that the Joint Resolution of May 7, 1940, and the Executive Order of April 10, 1940, put into effect a valid plan for control of the property covered by the regulation that prohibited any change of title to that property by reason of the subsequent appointment of petitioner as permanent receiver. We do not now undertake to say whether every determination of rights concerning blocked property in unlicensed litigation is voidable. We base our determination on the purpose of Congress to prevent shifts in title to blocked assets and the prohibition of the Executive Order against transfers of such a credit as this. The language of the order prohibits more than payment. It prohibits transfers of credit. We do not think the administrative rulings are to the contrary.

*Second.* The petitioner advances the contention, however, that title to AKM's claim against ASCAP had passed to him by his appointment as temporary receiver on June 12, 1941, prior to the freezing or blocking order of June 14, 1941. Therefore, petitioner argues, AKM had nothing that could be frozen by the immobilization order or taken by the vesting order.

The precise issue of state law involved, *i. e.*, whether the temporary receiver under § 977–b of the New York Civil Practice Act is vested with title by virtue of his appointment, is one which has not been decided by the New York courts. Both the District Court and the Court of Appeals faced this question and answered it in the negative. In dealing with issues of state law that enter into judgments of federal courts, we are hesitant to overrule decisions by federal courts skilled in the law of particular states unless their conclusions are shown

to be unreasonable. *Estate of Spiegel* v. *Commissioner*, 335 U. S. 701, 707–708; *Helvering* v. *Stuart*, 317 U. S. 154; *MacGregor* v. *State Mutual Co.*, 315 U. S. 280. We shall examine the problem from that point of view.

Having no state case on the precise statute before it, the Court of Appeals turned to cases dealing with temporary receiverships in equity proceedings and under analogous statutes. These cases seem to hold that temporary receivers of neither the equity [20] nor statutory [21] class obtain title, but, on the contrary, merely a right to possession. The courts below found nothing in § 977–b which evidenced an intent that the result under that section should be otherwise. Admittedly there is no express declaration of such an intent.

The statutory language is easily susceptible of varying interpretations. See subsections 4, 10, 11, 12 and 19. These sections are not clear as to the title taken by the temporary receiver or the authority granted to him for the holding or handling of claims against debtors. The Court of Appeals concluded, however, that where in subsection 12 the statute said that "any receiver appointed . . . shall have all the powers and duties . . .

---

[20] E. g., *Decker* v. *Gardner*, 124 N. Y. 334, 26 N. E. 814; see *Keeney* v. *Home Insurance Co.*, 71 N. Y. 396, 401.

[21] E. g., *Mutual Brewing Co.* v. *N. Y. & C. P. F. Co.*, 16 App. Div. 149, 45 N. Y. S. 101; *Metropolitan Life Ins. Co.* v. *Sanborn*, 34 Misc. 531, 69 N. Y. S. 1009; see N. Y. General Corporation Law §§ 162, 163, 168, and annotations thereto. Petitioner calls our attention to *Nealis* v. *American Tube & Iron Co.*, 150 N. Y. 42, 45, 44 N. E. 944, 945, a case not cited to the Court of Appeals. This case says that a temporary receiver under a different statute "is vested with title and represents the corporation and its creditors as fully as a permanent receiver after final judgment of dissolution." P. 45. This case, however, involved the right of a temporary receiver to sue and the opinion deals with that problem rather than the distinction between a right to obtain possession and title. See *In re Warren E. Smith Co.*, 31 App. Div. 39, 52 N. Y. S. 877, 884.

possessed by and conferred upon receivers and trustees by the laws of the state of New York," the meaning was "that a temporary receiver under this provision takes the usual powers of other temporary receivers in New York." 169 F. 2d 324, 327. It was pointed out that otherwise the specific and restricted grant of powers to a temporary receiver by subsection 4 would be purposeless.

Petitioner contends here for the first time that a vesting of title in the temporary receiver is an essential prerequisite to the exercise of jurisdiction *in rem* over the assets within the state of a nonresident association which is served by publication. The contention is that an affirmance of the court below on the issue of state law will render proceedings under § 977–b subject to an attack on constitutional grounds under the doctrine of *Pennoyer v. Neff*, 95 U. S. 714. In our opinion the argument is without merit. *Pennoyer v. Neff* merely holds that a personal judgment cannot be obtained against a nonresident on service by publication. It recognizes at p. 733 that for an *in rem* action it is sufficient that the property be within the state, subject to the control of the court, and that there be some form of service which is reasonably calculated to give notice to parties whose interests may be affected by the judgment. Cf. *Milliken v. Meyer*, 311 U. S. 457, 463. The first requirement can be met in other ways than seizure of title, *e. g.*, by an injunction against transfer of the property, *Pennington v. Fourth National Bank*, 243 U. S. 269; by an attachment, *Herbert v. Bicknell*, 233 U. S. 70; or by personal service on the party holding the property within the state, *Security Savings Bank v. California*, 263 U. S. 282. We have no doubt that where property is in a state and comes under the control of a court, as here by appointment of the temporary receiver, it is fair to permit substituted service. *Anderson Nat. Bank v. Luckett*, 321

U. S. 233, 240, *et seq.;* see *McDonald* v. *Mabee,* 243 U. S. 90.

Since the determination of the state law issue concerning the title of the temporary receiver by the courts below is not unreasonable, we accept it as correct for the purposes of this case.

A suggestion appears in petitioner's briefs, but not in the questions presented by the petition for certiorari, that the judgments below should be vacated and the case remanded to the District Court to be held until the parties can secure from the courts of New York a decision as to whether the temporary receiver took title to the claim against ASCAP. Waiving the failure to raise the issue by the petition for certiorari,[22] we consider the contention in deference to the earnestness with which the point is pressed in the dissent.[23] If the state law is that title passed to the temporary receiver on his appointment prior to the freezing order, the Custodian, by the assumption of the opinion, would obtain nothing by his order vesting AKM property. Such a ruling would make unnecessary consideration of any other issue.

This suggested procedure has been followed in order to avoid a decision on a federal constitutional issue— *Spector Motor Co.* v. *McLaughlin,* 323 U. S. 101; *Chicago* v. *Fieldcrest Dairies,* 316 U. S. 168; *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496; but cf. *Public Utilities Comm'n* v. *United Fuel Gas Co.,* 317 U. S. 456, 462–63— and where the only issue in the case was one of state law, although federal jurisdiction was based on the Bankruptcy Act. *Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478. We have refused in a diversity of citizenship case to allow the difficulty of an issue of state law to deter us

---

[22] *Connecticut R. & L. Co.* v. *Palmer,* 305 U. S. 493.

[23] Cf. *West* v. *Rutledge Timber Co.,* 244 U. S. 90, 100.

from exercising our jurisdiction when federal determination was subject to equitable discretion and the state issue was the only one in the case. *Meredith* v. *Winter Haven,* 320 U. S. 228.[24] To refrain from deciding it, we there said, would be to enervate diversity jurisdiction.

Where a case involves a nonconstitutional federal issue, however, the necessity for deciding which depends upon the decision on an underlying issue of state law, the practice in federal courts has been, when necessary, to decide both issues. This was the course we followed in *Markham* v. *Allen,* 326 U. S. 490, 495–6, a case arising under the Trading with the Enemy Act, where an issue was the construction of a state statute. The state law question in *Estate of Spiegel* v. *Commissioner, supra,* was concededly difficult and unsettled; its decision admittedly controlled the existence of a federal question, since a finding that there was no possibility of reverter under Illinois law would have finally determined the issue on which the case was decided. And yet, although a method may have existed for obtaining an adjudication on the issue from the Illinois courts, 335 U. S. 632, 673–4, this Court followed the procedure which we adopt here of depending upon the determination of state law by the Court of Appeals. 335 U. S. 701, 707–8. In so doing, it followed the decision in *Helvering* v. *Stuart,* 317 U. S. 154, 161, *et seq.* *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, a common-law case, is itself a precedent against any general ruling that cases properly in the federal courts that depend upon

---

[24] Where there is no suggestion to hold and send to a state court for the resolution of a state issue, we decide issues of state law. See cases in federal courts under-diversity jurisdiction. *Wichita Royalty Co.* v. *City National Bank,* 306 U. S. 103; *West* v. *A. T. & T. Co.,* 311 U. S. 223; *Fidelity Trust Co.* v. *Field,* 311 U. S. 169; *Six Companies* v. *Highway Dist.,* 311 U. S. 180; *Stoner* v. *New York Life Ins. Co.,* 311 U. S. 464; *Palmer* v. *Hoffman,* 318 U. S. 109, 117.

state law should have that issue submitted to state courts for decision. See the later decision in the same case, *Tompkins* v. *Erie R. Co.,* 98 F. 2d 49.

The cases mentioned above where this Court required submission of single issues, excised from the controversy, to state courts were cases in equity. The discretion of equity as to the terms upon which it would grant its remedies, in the light of our rule to avoid an interpretation of the Federal Constitution unless necessary, was relied upon to justify a departure from normal procedure. In the *Magnolia* case, we directed that the trustee file plenary proceedings to determine title in a state court litigation necessarily complete in itself. The complaint here in a single count seeks recovery of the debt from ASCAP and determination of the Custodian's title to the claim *vis-à-vis* the receiver. Assuming that quieting title to a chattel is an equitable proceeding and that the District Court can, by cutting out the title issue and by refusing to proceed in the controversy unless obeyed, compel the Custodian by whatever proceedings New York may provide to litigate only the narrow issue of title in the temporary receiver, there would remain the problem of control of the receiver, by threats of contempt action, to keep him from raising in such proceedings federal issues such as the right to secure title as permanent receiver through state judicial action after the freezing or immobilization order. This federal issue we decided above. Furthermore, as the state court could reasonably require complete adjudication of the controversy, the District Court would perhaps be compelled to stay proceedings in the state court to protect its own jurisdiction. 28 U. S. C. § 2283. Otherwise, in sending a fragment of the litigation to a state court, the federal court might find itself blocked by *res judicata,* with the result that the entire federal controversy would be ousted from the

federal courts, where it was placed by Congress. See note 17, *supra.*

The submission of special issues is a useful device in judicial administration in such circumstances as existed in the *Magnolia, Spector, Fieldcrest* and *Pullman* cases, *supra,* but in the absence of special circumstances, 320 U. S. at 236, 237, it is not to be used to impede the normal course of action where federal courts have been granted jurisdiction of the controversy.

We reject the suggestion that a decision in this case in the federal courts should be delayed until the courts of New York have settled the issue of state law.

*Third.* The petitioner makes the further point that the judgment below determining that he had no right, title or interest to the claim of AKM against ASCAP is beyond the competence of the federal district court because that property was in the hands of the state court by virtue of the receivership. Even if title did not pass, he argues, he, and through him the state court, had possession of the claim by virtue of his appointment as temporary receiver before the promulgation of the freezing order. Reliance is placed on the rulings of cases like *Kline* v. *Burke Construction Co.,* 260 U. S. 226, 229, 231; *Princess Lida* v. *Thompson,* 305 U. S. 456, 466; and *Farmers' Loan Co.* v. *Lake St. R. Co.,* 177 U. S. 51, 61. The rule declared by these cases is that when one court has taken possession and control of a *res,* a second court is disabled from exercising a power over that *res.* The circumstances of this controversy do not present such an interference with state control of a *res.* We are dealing with a situation more closely resembling determinations of rights to participate in *res* in the hands of state courts.[25] What

---

[25] See *Markham* v. *Allen,* 326 U. S. 490; *Commonwealth Trust Co.* v. *Bradford,* 297 U. S. 613; *Clark* v. *Tibbetts,* 167 F. 2d 397, 401.

the state court had, at most, was a claim against a debtor, ASCAP. The judgment enabled the Custodian to collect the debt that ASCAP owed AKM. Although this judgment determined title to AKM's claim against ASCAP when the adverse claimant was a state receiver, those facts did not prevent the federal court from giving a judicial declaration of the right to the claim. The scheme of the Trading with the Enemy Act contemplates that federal courts may provide such determinations. § 17; cf. *Markham* v. *Allen*, 326 U. S. 490, 495. The congressional purpose to put control of foreign assets in the hands of the President through the Custodian, so that there might be a unified national policy in the administration of the Act, argues strongly for federal determination of issues of rights in the blocked assets. Comity does not require abnegation to the extent that a federal court cannot adjudicate rights to the claim involved.

*Affirmed.*

MR. CHIEF JUSTICE VINSON took no part in the consideration or decision of this case.

MR. JUSTICE JACKSON dissents on the ground that ASCAP is not a banking institution under the definition in Executive Order No. 8785.

MR. JUSTICE FRANKFURTER, dissenting in part.

The Court recognizes that central to determining the effect of the Alien Property Custodian's freezing and vesting orders is the effect under New York law of petitioner's appointment as temporary receiver on June 13, 1941. It observes that "The precise issue of state law involved, *i. e.,* whether the temporary receiver under § 977–b of the New York Civil Practice Act is vested with title by virtue of his appointment, is one which has not been

decided by the New York courts."² And it concedes that the language of the relevant New York statutes "is easily susceptible of varying interpretations." Yet it puts its own interpretation on those statutes though that interpretation may be displaced tomorrow by the only courts which have power to render an authoritative interpretation of New York law—the courts of the State of New York.

In other cases that have come before us in which decision of a federal issue or the necessity for its decision depended on a seriously doubtful question of State law, we have directed that application should first be made to the courts of the State for final disposition of the State question. *Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478; *Railroad Comm'n of Texas* v. *Pullman Co.,* 312 U. S. 496; *Chicago* v. *Fieldcrest Dairies,* 316 U. S. 168; *Spector Motor Service, Inc.* v. *McLaughlin,* 323 U. S. 101; *A. F. of L.* v. *Watson,* 327 U. S. 582. In each of these cases the discretion of a federal court of equity could practicably be exercised in a way which retained ultimate jurisdiction of the case while permitting adjudication of the State question in the State courts. In each there were available State procedures capable of providing a prompt decision, and the litigation had not already consumed such an unconscionable amount of time as to make recourse to them inexpedient. Cf. *Public Utilities Comm'n* v. *United Fuel Gas Co.,* 317 U. S. 456. The present case meets all those conditions, see N. Y. Civ. Prac. Act § 473, and should receive the same disposition.

It is true that in all but one of these cases recourse to the State courts also served the purpose of avoiding what might have proved to be unnecessary decision of a constitutional issue. But see *Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478. Even more fundamental, however, was recognition of the importance of maintain-

ing harmonious relations between parallel systems of
State and federal courts in a situation where, because
State law controlled, the State courts had the last word
and so a federal court at best could make only an in-
formed guess. That this was a dominant consideration
in the mind of the Court appears plainly in the language
of its opinions. The following passages are illustrative:

1. "The last word on the meaning of Article 6445 of
the Texas Civil Statutes, and therefore the last word on
the statutory authority of the Railroad Commission in this
case, belongs neither to us nor to the district court but
to the supreme court of Texas. In this situation a federal
court of equity is asked to decide an issue by making a
tentative answer which may be displaced tomorrow by a
state adjudication. . . . The reign of law is hardly pro-
moted if an unnecessary ruling of a federal court is thus
supplanted by a controlling decision of a state court. . . .

"Few public interests have a higher claim upon the dis-
cretion of a federal chancellor than the avoidance of need-
less friction with state policies, whether the policy relates
to the enforcement of the criminal law, *Fenner* v. *Boy-
kin*, 271 U. S. 240; *Spielman Motor Co.* v. *Dodge*, 295
U. S. 89; or the administration of a specialized scheme
for liquidating embarrassed business enterprises, *Penn-
sylvania* v. *Williams*, 294 U. S. 176; or the final authority
of a state court to interpret doubtful regulatory laws of
the state, *Gilchrist* v. *Interborough Co.*, 279 U. S. 159;
cf. *Hawks* v. *Hamill*, 288 U. S. 52, 61. These cases re-
flect a doctrine of abstention appropriate to our federal
system whereby the federal courts, 'exercising a wise dis-
cretion,' restrain their authority because of 'scrupulous
regard for the rightful independence of the state govern-
ments' and for the smooth working of the federal judiciary.
See *Cavanaugh* v. *Looney*, 248 U. S. 453, 457; *Di Gio-*

*vanni* v. *Camden Ins. Assn.*, 296 U. S. 64, 73." *Railroad Comm'n of Texas* v. *Pullman Co.*, 312 U. S. 496, 499–501.

2. "We are of the opinion that the procedure which we followed in the *Pullman* case should be followed here. Illinois has the final say as to the meaning of the ordinance in question. It also has the final word on the alleged conflict between the ordinance and the state Act. The determination which the District Court, the Circuit Court of Appeals, or we, might make could not be anything more than a forecast—a prediction as to the ultimate decision of the Supreme Court of Illinois. . . . As we said in the *Pullman* case, 'The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision' and any 'needless friction with state policies.' . . . It is an exercise of a 'sound discretion, which guides the determination of courts of equity.' *Beal* v. *Missouri Pacific R. Co.*, [312 U. S. 45, 50]. In this case, that discretion calls for a remission of the parties to the state courts, which alone can give a definitive answer to the major questions posed. Plainly, they constitute the more appropriate forum for the trial of those issues. See 54 Harv. L. Rev. 1379. Considerations of delay, inconvenience, and cost to the parties, which have been urged upon us, do not call for a different result. For we are here concerned with the much larger issue as to the appropriate relationship between federal and state authorities functioning as a harmonious whole." *Chicago* v. *Fieldcrest Dairies*, 316 U. S. 168, 171–73.

3. ". . . if, as the District Court thought, this Florida law is not self-executing, suits seeking to raise the due process question or any other constitutional question would be premature until Florida supplied sanctions for its enforcement. A decision today on the merits might, therefore, amount to no more than an advisory opinion. . . . The resources of equity are not inadequate

to deal with the problem so as to avoid unnecessary friction with state policies, while selective cases go forward in the state courts for an orderly and expeditious adjudication of the state law questions." *A. F. of L. v. Watson,* 327 U. S. 582, 598–99.

So here, though no constitutional issue is present, regard for the respective orbits of State and federal tribunals is the best of reasons, as a matter of judicial administration, for requiring a definitive adjudication by the New York courts rather than proceeding on the basis of our own tentative guess as to the meaning of the New York statutes. That federal issues may remain is no justification for refusing to submit to the New York courts a separable issue of New York law. We have no occasion to assume that they will go on to decide these federal questions when a federal court has expressly retained jurisdiction to decide them. Cf. *Federal Power Comm'n v. Pacific Power & L. Co.,* 307 U. S. 156, 160.

We should remand the case to the District Court with instructions to retain jurisdiction pending submission to the courts of New York by appropriate proceedings of the question whether title to AKM's claim against ASCAP passed to petitioner upon his appointment as temporary receiver.