## McGRATH, Attorney General v. AGENCY OF CHARTERED BANK OF INDIA, AUSTRALIA & CHINA.

United States District Court
S. D. New York.

May 9, 1952.

Harold I. Baynton, Asst. Atty. Gen., Myles J. Lane, U. S. Atty., Southern District of New York, New York City, James D. Hill, Walter T. Nolte, and Myron C. Baum, Attys., Department of Justice, all of Washington, D. C. for plaintiff.

Duer, Strong & Whitehead, New York City (Harry H. Wiggins, Harman Hawkins, New York City, of counsel), for defendant.

IRVING R. KAUFMAN, District Judge.

The Court has before it cross motions for summary judgment under Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.A. Both parties agree that there are no issues of fact requiring a trial and that judgment depends only upon interpretation of law.

During 1939, four firms of Hamburg, Germany delivered to the Hamburg Agency

of Chartered Bank of India, Australia and China[1] (hereinafter referred to as Chartered Bank) eighteen bills of exchange in the amount of $6,217.22 for collection in the Philippines. They were transmitted to three branches of Chartered Bank in the Philippines and were collected for the account of the German customers. The proceeds of collection, instead of being remitted to Hamburg, were forwarded to defendant where they were entered as a credit on defendant's books in its "Hamburg Office U.S. Dollar Account." Between September 23, 1939 and January 23, 1940 this account was credited with $6,217.22 representing the proceeds of collections of the bills of exchange.

Between July 8, 1939 and December 5, 1939 the four German firms became indebted to the Hamburg Agency in the amount of £5,837.3.6. sterling and $613.99 for unpaid bills of exchange negotiated by the Agency. This indebtedness has been partially reduced, and it is defendant's claim that the funds instantly vested are to be used by the London office as a setoff against the indebtedness which obligates certain of the German firms to the Hamburg Agency. As a result, it says, there will in fact be nothing owing to these firms and therefore nothing to vest.

On April 27, 1949 defendant applied to the Attorney General[2] for a license to transfer the $6,217.22 from its Hamburg U.S. Dollar Account to its London Dollar Account in fulfillment of a request from Chartered Bank's head office in London,[3] Defendant was requested to advise the Office of Alien Property whether these funds were the property of the Hamburg Agency or merely represented proceeds of collections made for the account of customers of the Hamburg Agency. Defendant replied that they represented collections due the customers and that those customers were indebted to the Hamburg Agency in pounds sterling for unpaid advance bills (exports) negotiated by the Hamburg Agency. In that letter, and as was set out *supra,* defendant also said that the London office of Chartered Bank wished to utilize the $6,217.22 in defendant's Hamburg U.S. dollar account as a partial setoff against the pounds sterling owed on the unpaid export bills.

The application to the Office of Alien Property was denied and the funds subsequently vested.[4] When defendant refused to comply with the Vesting Order this action was commenced by invoking the jurisdiction of this Court under Section 7 of the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 7, and under 28 U.S.C.A. § 1345 to enforce compliance with the Vesting Order.

The disposition of the cross motions turns on the determination of two essential issues in the case:

1. Is the credit of $6,217.22 on defendant's books a debt to the German firms, representing property within the United States and therefore subject to vesting?

2. Are the debts and the alleged setoffs thereto mutual, that is, are the New York and Hamburg Agencies of Chartered Bank one and the same business entity for instant purposes?

1. Chartered Bank was incorporated by Royal Charter in Great Britain on December 28, 1853. The institution is now global and operates overseas through many agencies and branches. Defendant was established on August 27, 1902 and is authorized to do business in New York by license issued by the State Superintendent of Banks.

2. By Executive Order No. 9788, effective October 15, 1946, 11 F.R. 11981, 50 U.S. C.A.Appendix, § 6 note, the Attorney General succeeded to the function and powers of the Alien Property Custodian.

3. The funds were in a blocked account by Executive Order 8389, as amended, 12 U.S.C.A. § 95a note, which "froze" all credits held by or on behalf of certain foreign nationals. Transfers or withdrawals of such funds are prohibited except by license from the Secretary of the Treasury, whose licensing authority was eventually transferred to the Attorney General by Executive Order 8389.

4. Vesting Order No. 14364, February 21, 1950 (15 F.R. 1259).

## I.

At the outset I stress the thoroughly grounded doctrine that for the purposes of the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 1 et seq., a debt is property which may be seized by the appropriate federal authority, in this case the Attorney General. McGrath v. Manufacturers Trust Co., 1949, 338 U.S. 241, 70 S.Ct. 4, 94 L.Ed. 31; Propper v. Clark, 1949, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480; American Exchange Nat. Bank v. Garvan, 2 Cir., 1921, 273 F. 43, affirmed 1922, 260 U.S. 706, 43 S.Ct. 165, 67 L.Ed. 474; Miller v. Rouse, D.C.S.D.N.Y.1921, 276 F. 715; Kohn v. Jacob & Josef Kohn, D.C.S.D.N.Y.1920, 264 F. 253; Clark v. E. J. Lavino & Co., D.C.E.D.Pa.1947, 72 F. Supp. 497.

Defendant, although not contesting this principle, asserts its inapplicability. The assertion comes down to two propositions which defendant states in this order:

(a) Only the balance of the debt after setoffs is subject to seizure.

(b) The debt, having been collected in the Philippines and payable in Hamburg, is not property within the United States subject to seizure.

In support of the proposition that there is no property within the United States, defendant argues that the debt was payable in Germany. But the place of payment is not the criterion of a debt's situs. Chicago, Rock Island & Pacific Railway Co. v. Sturm, 1899, 174 U.S. 710, 19 S.Ct. 797, 43 L.Ed. 1144. What does control the power to enforce payment of a debt is the court's power over the person of the debtor. Blackstone v. Miller, 1903, 188 U.S. 189 at pages 205–206, 23 S.Ct. 277, at page 278, 47 L.Ed. 439, per Mr. Justice Holmes:

"But it is plain that the transfer [of the deposit] does depend upon the law of New York, not because of any theoretical speculation concerning the whereabouts of the debt, but because of the practical fact of its power over the person of the debtor. The principle has been recognized by this court with regard to garnishments of a domestic debtor of an absent defendant. Chicago, Rock Island & Pacific Ry. Co. v. Sturm, 174 U.S. 710, 19 S.Ct. 797, 43 L.Ed. 1144. See Wyman v. Halstead, 109 U.S. 654, 3 S.Ct. 417, 27 L.Ed. 1068. What gives the debt validity? Nothing but the fact that the law of the place where the debtor is will make him pay * * *. Power over the person of the debtor confers jurisdiction * * *."

To the same effect, and bearing immediately upon a debt under the Trading with the Enemy Act see: Cities Service Company v. McGrath, 1952, 342 U.S. 330 72 S.Ct. 334, which succinctly states the rule of law applicable here and the policy considerations which defeat an argument such as the one defendant advances. By analogy supporting the principle of law stated in the Cities Service case, see Morris Plan Industrial Bank of New York v. Gunning, 1946, 295 N.Y. 324, 67 N.E.2d 510, dealing with power under state law to attach debts in the form of wages and Cronan v. Schilling, Sup.1950, 100 N.Y.S.2d 474, dealing with power under state law to attach debts in the form of bank deposits.

Since a debt is property which may be seized under the Trading with the Enemy Act, and since the court's power to enforce payment of a debt depends upon its power over the debtor, plaintiff will prevail in this area of the argument if the funds here are a debt and if defendant is the debtor therefor. On the facts before me, I am convinced that this is so. Plaintiff's Exhibit 3 is a letter from defendant to the Office of Alien Property, dated July 27, 1949 and stating in part:

"With reference to your letter of 24th June, we wish to advise that [the $6,217.22] * * * represent proceeds of collection for account of and due to customers of our Hamburg office * * *."

Measured by the subjective standard of defendant's own view of these funds, they represented a debt for which defendant was the responsible debtor. In seeking an objective standard by which to evaluate the funds, it is well to reiterate that the sum represents the proceeds of the col-

lection of eighteen bills of exchange deposited by the German nationals with the Hamburg Agency of Chartered Bank for collection in the Philippines. The holder of such proceeds, defendant here, is the debtor of the owner of the instrument. People v. City Bank of Rochester, 1883, 93 N.Y. 582; Carson v. Federal Reserve Bank, 1930, 254 N.Y. 218, 172 N.E. 475, 70 A.L.R. 435; Leonardi v. Chase National Bank, 1942, 263 App.Div. 552, 33 N.Y.S.2d 706. Insistence that transfers of this kind are simply bookkeeping mechanics and not the forwarding of the fund proper does not contravene the fact that book entries such as here involved are the equivalent of the fund, credit being the means of payment in day-to-day banking practice. Leonardi v. Chase National Bank, supra. Chief Justice Cardozo, speaking for the New York Court of Appeals in Carson v. Federal Reserve Bank, supra, appropriately said, 254 N.Y. at pages 230–231, 172 N.E. at page 479:

"We must say whether the agent became subject to the liability of an owner when instead of remitting the proceeds of collection directly to its principals, it put the proceeds to their credit in an ordinary deposit account, thereby turning the relation from one of agency into one of creditor and debtor. In effect, the situation was then the same as if [the bank] receiving the money in the capacity of agent, had handed it over to the principals, and had received it back at once to be retained as a deposit. Commercial Nat. Bank of Penn[sylvania] v. Armstrong, 148 U.S. 50, 58, 59, 13 S.Ct. 533, 37 L.Ed. 363; Marine Bank v. Fulton County Bank, 2 Wall. 252, 17 L.Ed. 785; Evansville Bank v. German-American Bank, 155 U.S. 556, 15 S.Ct. 221, 39 L.Ed. 259; National Butchers' & Drovers' Bank v. Hubbell, 117 N.Y. 384, 396, 22 N.E. 1031, 7 L.R.A. 852, 15 Am.St.Rep. 515; Langley v. Warner, 3 N.Y. 327, 329."

I conclude that the credit of $6,217.22 on defendant's books is a debt to German nationals representing property within the United States and therefore subject to vesting by the Attorney General.

## II.

The second issue in the cross motions involves the question of whether or not the debts and the alleged setoffs thereto are mutual. The question is answered by determining whether defendant and the Hamburg Agency of Chartered Bank are individual business entities or are one and the same entity.

This is essential because, as the parties in effect concede and as the courts have so held, debts to be applied against each other must be mutual. Libby v. Hopkins, 1881, 104 U.S. 303, 26 L.Ed. 769; Sawyer v. Hoag, 1873, 17 Wall. 610, 21 L.Ed. 731; In re Consolidated Indemnity & Insurance Co., 1941, 287 N.Y. 34, 38 N.E.2d 119. Defendant's affidavit and exhibits "B", "C" and "D" thereto attest to the fact that four German firms owed certain debts to the Hamburg Agency of Chartered Bank. If the Hamburg Agency and defendant are one and the same entity, then, of course, there is that mutuality which would permit a setoff as between New York and Hamburg Agencies on the one hand and the German nationals on the other. If they are independent entities, then defendant owes to the German nationals who, in turn owe to Hamburg Agency, and no setoff is possible since mutuality is wanting. The equities of the case play no part in the mutuality doctrine. Only the facts are determinative if there is, indeed, mutuality.

The structure of international banking houses such as Chartered Bank defies one rigorous description. Suffice it to say for present analysis, branches or agencies of an international bank have been held to be independent entities for a variety of purposes (a) deposits payable only at branch where made; Murtaugh v. Yokohoma Specie Bank, Ltd., 1933, 149 Misc. 693, 269 N.Y.S. 65; Bluebird Undergarment Corp. v. Gomez, 1931, 139 Misc. 742, 249 N.Y.S. 319; (b) checks need be honored only when drawn on branch where deposited; Chrzanowska v. Corn Exchange Bank, 1916, 173 App.Div. 285, 159 N.Y.S. 385, affirmed

1919, 225 N.Y. 728, 122 N.E. 877; (c) subpoena *duces tecum* on foreign branch bank's records barred; In re Harris, D.C.S.D. N.Y.1939, 27 F.Supp. 480; (d) a foreign branch separate for collection of forwarded paper; Pan-American Bank and Trust Company v. National City Bank of New York, 2 Cir., 1925, 6 F.2d 762, certiorari denied 1925, 269 U.S. 554, 46 S.Ct. 18, 70 L.Ed. 408. Thus in law there is nothing innately unitary about the organization of international banking institutions.

Defendant, upon its oral argument and in its brief, relies heavily upon Sokoloff v. National City Bank of New York, 1928, 250 N.Y. 69, 164 N.E. 745, as authority for the proposition that Chartered Bank, not the Hamburg or New York Agency, is ultimately responsible for the amounts owing its German customers and, conversely, it is to Chartered Bank that the German firms owe their obligations. The Sokoloff case, aside from its violently different fact situation, is centered on the legal problem of default of payment and consequent breach of contract by a branch bank.[5] It is authority merely for the principle *that in a factual situation as presented in that case* the various branches will be considered a part of a single corporation. It does not stand for the principle that in *every instance* an international bank with branches is but one legal entity for all purposes. The defendant concedes in its brief (p. 15) that there are purposes for which the various agencies and branches of Chartered Bank may be treated in law as separate entities. I fail to see the applicability of Sokoloff either as a guide to or authority for the resolution of this problem. The facts before me and the cases catalogued supra lend weight to the view that we are dealing here with Agencies independent of one another.

Conclusive of this view is the definition of "banking institutions" in section 5(F) of Executive Order No. 8389, as amended, which was promulgated pursuant to Section 5(b) of the Trading with the Enemy Act. It provides in part:

"* * * and, each principal, agent, home office, branch or correspondent of any person so engaged [in the banking business] shall be regarded as a separate 'banking institution' ".[6]

Mr. Justice Reed, in Propper v. Clark, supra, 337 U.S. at page 481, 69 S.Ct. at page 1339, said of this presidential power to define "banking institutions":

"* * * the President's wide power to define 'banking institution' was a ready instrument to cope with the myriad circumstances arising in the control of shifts of foreign assets. The power in peace and in war must be given generous scope to accomplish its purpose. Through the Trading with the Enemy Act, in its various forms, the nation sought to deprive enemies, actual or potential, of the opportunity to secure advantages to themselves or to perpetrate wrongs against the United States or its citizens through the use of assets that happened to be in this country."

I hold that for instant purposes the Hamburg Agency and defendant were independent business entities, and the attempted setoff may not be utilized by defendant against its debt to the German firms obligated to the Hamburg Agency.

Plaintiff's motion for summary judgment is granted and defendant's motion is denied.

Settle order.

---

5. The Sokoloff case, incidentally, is curiously in harmony with the tenor of this opinion, particularly in its distinction between substantive and merely procedural bookkeeping entries.

6. Section 2 of the Joint Resolution of May 7, 1940, 54 Stat. 179 and Section 302 of Title III of the First War Powers Act, 1941, 55 Stat. 840, 50 U.S.C.A. Appendix, § 617 are subsequent congressional ratifications of this definition.