**CARR v. YOKOHAMA SPECIE BANK, Limited, OF SAN FRANCISCO et al.**

**McGRATH, Attorney General, v. CARR.**

**CARR v. McGRATH, Attorney General.**

**No. 22509–S.**

United States District Court
N. D. California, S. D.

Aug. 17, 1951.

Louis J. Glicksberg, San Francisco, Cal., for plaintiff.

S. M. Saroyan and Harry P. Calvert, San Francisco, Cal., for defendants Yokohama Specie Bank, Limited, of San Francisco, a foreign corporation, and Maurice C. Sparling, Superintendent of Banks of State of California, and Liquidator of Yokohama Specie Bank, Limited, of San Francisco.

Valentine C. Hammack, Sp. Asst. to Atty. Gen., Arthur J. DeLorimier, Atty., Office of Alien Property, Dept. of Justice, San Francisco, Cal., and Percy Barshay, Sp. Asst. to Atty. Gen., for plaintiff in intervention.

ROCHE, Chief Judge.

This is an action in equity whereby the plaintiff, as Trustee in Bankruptcy of Nippon Yusen Kaisya, a corporation, seeks to have the balance in a bank account in the Yokohama Specie Bank, Ltd., of San Francisco, impressed with a resulting trust in favor of the bankrupt. Nippon Yusen Kaisya, hereinafter referred to as "NYK", is a Japanese shipping company that prior to December 8, 1941, maintained an office in San Francisco. Defendant Yokohama Specie Bank, Ltd., of San Francisco, hereinafter referred to as "YSB San Francisco", is the local office of the Japanese banking company by the same name. Defendant Maurice C. Sparling is the Superintendent of Banks of the State of California and the Liquidator of YSB San Francisco, in Liquidation. He will be hereinafter referred to as the "Superintendent".

Plaintiff in intervention and cross-defendant is J. Howard McGrath, Attorney General of the United States, as successor to James E. Markham, former Alien Property Custodian. Mr. McGrath will be hereinafter referred to as the "Attorney General".

The trial, which was to the Court without a jury, has presented two issues for decision, one of fact and one of law, as follows:

I. Did NYK furnish or provide the consideration out of which the bank account involved arose?

II. Even if it did, was it a transaction to which the courts can give judicial recognition since it was in violation of Federal laws?

These issues arise out of the following set of facts, as disclosed by the record.

In the period immediately preceding the outbreak of war between the United States and Japan, various vessels owned by NYK operated between the two countries, carrying passengers and cargo. Among these was the M. S. Tatuta Maru. During that period NYK incurred various obligations to American creditors arising out of the operation of its vessels. When, on July 26, 1941, the President of the United States issued Executive Order No. 8832, 12 U.S. C.A. § 95a note, extending to Japan and Japanese Nationals the freezing controls imposed upon other countries by Executive Order No. 8389, 12 U.S.C.A. § 95a note, NYK became greatly concerned lest its American creditors attach its vessels in order to satisfy their claims and the Japanese Government became concerned lest it be unable to return its nationals from the United States to Japan. Efforts by the Japanese Government to have NYK exempted from the freezing order were unsuccessful and it was then decided that the same result could be accomplished if the Japanese Government requisitioned NYK's ships and operated them as Japanese Government requisitioned vessels. Accordingly, in October, 1941, the Tatuta Maru was requisitioned by the Japanese Government and in that capacity it made its final voyage between the United States and Japan prior to the outbreak of war on December 7, 1941.

The freezing order which gave rise to the foregoing transaction was, so far as pertinent, as follows:

Sec. 1. All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury by means of regulations, rulings, instructions, licenses or otherwise, if (i) such transactions are by, or on behalf of, or pursuant to the directions of any foreign country designated in this Order, or any national thereof, if (ii) such transactions involve property in which any foreign country designated in this Order, or any national thereof, has at any time on or since the effective date of this Order had any interest of any nature whatsoever, direct or indirect:

"A. * * * all transfers of credit between any banking institution within the United States and any banking institution outside the United States (including any principal, agent, home office, branch, or correspondent outside the United States, of a banking institution within the United States);

"B. All payments by or to any banking institution within the United States;
* * * * * *

"F. Any transaction for the purpose or which has the effect of evading or avoiding the foregoing prohibitions."

Thus the Japanese Government, the Yokohama Specie Bank, and NYK were prohibited from transferring any credit from a bank in Japan to a bank in the United States, and from making any payment to a bank in the United States if the Japanese Government or a Japanese national had any interest, direct or indirect, in such credit or payment, unless such transfer or payment was licensed by the Secretary of the Treasury.

It was stipulated between the parties that the opening of the bank account involved and all transactions pursuant thereto were subject to this freezing order.

Pursuant to the provisions of the Order, the Secretary of the Treasury issued General License No. 1 on April 30, 1940. As amended and in effect at the times pertinent to this case, it provided, in relevant part:

"A general license is hereby granted authorizing any payment or transfer of credit to a blocked account in a domestic bank in the name of any blocked country or nation-

al thereof providing the following terms and conditions are complied with:

* * * . * * . *

"(ii) This general license shall not be deemed to authorize:

"A. Any payment or transfer to any blocked account held in a name other than that of the blocked country or national there of who is the ultimate beneficiary of such payment or transfer * * *."

On October 21, 1941, the Japanese Government through Yoshio Muto, Consul General of Japan at San Francisco, made application to the United States Treasury Department, requesting that YSB San Francisco be allowed to receive a remittance in the sum of $39,000 from the Japanese Government for deposit into a blocked account, in the name of Yoshio Muto, for the purpose of making ship disbursements for the Japanese Government requisitioned ship. It should be noted that in this application, which was made under oath, the Japanese Government expressly represented and warranted that no other than the Japanese Government had any interest, direct or indirect, in the remittance for which a license was applied for therein.

Pursuant to this application the Treasury Department, on October 29, 1941, issued License No. S. F. 11630, authorizing the Consul General of Japan in San Francisco to receive a remittance from the Imperial Japanese Government through the Yokohama Specie Bank, Ltd., Tokyo Office, upon the condition that the money be deposited into a Special Blocked Account in the name of Yoshio Muto, Consul General of Japan, solely for the purpose of ship disbursements pursuant to special licenses authorizing said disbursements.

After the Japanese Government had made its application but before the license had issued, NYK also made an application. In this application No. S. F. 11535, which was subscribed and sworn to on October 22, 1941, NYK stated as follows:

"The applicant (NYK) desires a license in order to: To handle the Japanese Government requisitioned ship Tatuta Maru in the port of San Francisco, due on or about Oct. 30, 1941, as authorized by the Power of Attorney executed by Yoshi Muto, Consul General of Japan at San Francisco. A notarized true copy of the original thereof is herewith attached * * *.

"Such action will involve assisting in issuing of tickets for passage fares at this San Francisco Office, and the sub-branch at Los Angeles, and other affairs in connection with the ship's operation. All receipts and all disbursements entered into this operation are independent and bear no connection with the Nippon Yusen Kaisya fund."

By the Power of Attorney which was attached to this application the Japanese Government authorized NYK to act as its Attorney in Fact in all matters, business, operation and affairs arising in connection with the call of the said M. S. Tatuta Maru at the port of San Francisco on October 30, 1941, to November 21, 1941.

On October 29, 1941, the bank account involved was opened in YSB San Francisco with an initial deposit of $39,000 in the name of Consul General Yoshio Muto, Special Account. Just prior to the opening of this account the Consul General applied to the Treasury Department for a license authorizing the Consul General to receive the sum of approximately $68,000 into the account involved resulting from the operation of the Japanese Government requisitioned ship. This application was granted and between October 29, 1941, and November 22, 1941, the further sum of $66,811.42 was deposited in the Special Account. This additional deposit represented income from the sale of tickets for passage fares on the Japanese Government requisitioned and operated ship.

Between November 1, 1941, and December 2, 1941, the total sum of $39,053.28 was withdrawn from the Special Account. Of this amount $4,771.56 was for payment of an agency fee to NYK.

All of the foregoing transactions were had under licenses issued by the Treasury Department pursuant to application made therefor, and in each case the Japanese Government through its Consul General again under oath stated and warranted that no one other than the Japanese Government

had any interest in the funds in said Special Account.

On December 7, 1941, the Special Account contained a balance of $66,882.15 and it is this sum that is the subject of this litigation.

On December 8, 1941, defendant Superintendent took over YSB San Francisco for the purposes of conservatorship and/or liquidation under Section 135c and 136 of the Bank Act of the State of California, Gen.Laws, Act 652.

On or about April 23, 1942, NYK was adjudicated a bankrupt.

On October 3, 1942, under the authority of the Trading With the Enemy Act, as amended, 50 U.S.C.A.Appendix, § 1 et seq., and Executive Order No. 9095, as amended, 50 U.S.C.A.Appendix, § 6 note, the Alien Property Custodian of the United States served upon the Superintendent, Supervisory Order No. 39 and Vesting Order No. 1324. This required the Superintendent to supervise the business enterprise and property of YSB San Francisco pursuant to the terms of the Supervisory Order and the laws of the State of California. Under Section 136 of the Bank Act of California the Superintendent could reject any claim if he doubted its justice or validity. Under the Supervisory Order he was required to notify the Alien Property Custodian of the nature and amount of the claim and the Alien Property Custodian reserved the right to take whatever action might be necessary or advisable regarding the claim.

Plaintiff presented his claim to the bank account involved; it was rejected by the Superintendent and this action followed.

Plaintiff does not dispute the foregoing facts but contends that the requisition of the Tatuta Maru was not a bona fide transaction; that, on the contrary, it was a matter of form only, done to enable the ship to enter and leave American ports without interference from NYK's American creditors and carried out with the knowledge and approval of the United States Department of State; that NYK in fact furnished the money with which the Japanese Government opened the Special Account in YSB San Francisco and was thus the beneficial owner thereof; and that the Attorney General, as successor to the Alien Property Custodian, stands in no better position with relation to such account than would the Government of Japan.

Defendants and plaintiff in intervention maintain that the plaintiff has failed to prove, by competent evidence, any beneficial ownership by NYK. They further maintain that if NYK had any interest in the moneys in the Special Account, such undisclosed interest can be given no judicial recognition because of the lack of authorization by the Secretary of the Treasury of the United States for any transfer of banking credits or payment of moneys into the said account for the benefit of NYK.

 To support his position the plaintiff introduced documentary evidence and the deposition of one Seishi Hiroyoshi taken in Tokyo on interrogatories and cross-interrogatories. Much of this evidence was admitted subject to motion to strike on the ground that it was hearsay and no foundation had been laid. The deposition discloses that the witness was employed in NYK's New York office during the period involved and that his only knowledge of the transaction came from certain papers that he found in the files of NYK's Tokyo office several years later. The Court was liberal in admitting such evidence, having in mind that this is an action in equity. However, it is axiomatic that to establish a resulting trust the evidence must be clear and convincing. In this case, while there is evidence of questionable competence that indicates that NYK furnished the money with which the Special Account was opened, it does not follow that a trust relationship was thereby created. To find such a trust relationship the Court would have to rely on opinions and conclusions of the witness and on certain correspondence had between NYK Tokyo and Japanese Government officials, months and even years after the events herein and after the interests of the United States had intervened. When this evidence is weighed against the undisputed evidence

**8**

that the Tatuta Maru was operated as a Japanese Government requisitioned vessel, that NYK and the Government of Japan stated under oath that no one other than the Government of Japan had any interest in the bank account involved, and that NYK applied for and received permission from the Treasury Department to be paid an agency fee for its handling of the ship, it falls short of meeting the "clear and convincing" test necessary to establish a resulting trust.

Had plaintiff succeeded, however, his position would be no better. As to NYK the transfer of banking credits from YSB Tokyo to the Muto blocked account in YSB San Francisco and the deposit of additional moneys therein was an unlicensed transaction and hence illegal. The money was lawfully in this country only if the Government of Japan was the sole party having any interest in the fund. To recognize plaintiff's claim would be, in effect, to give judicial approval to an illegal scheme designed to evade the provisions of the freezing order.

The effect of an unlicensed transaction was considered by the United States Supreme Court in the case of Propper v. Clark, 337 U.S. 472, 69 S.Ct. 1333, 93 L.Ed. 1480. There, two days before the freezing order went into effect, a New York State court had appointed a temporary receiver of an Austrian association which admittedly had a valid claim for royalties against ASCAP, an American association. The order of appointment directed the receiver to take all the Austrian association's assets within the state of New York and hold them until the further order of the court. Several months later the state court ordered the receivership made permanent and directed the transfer of the association's claim to the receiver. Subsequently the Alien Property Custodian vested title and litigation between the receiver and the Custodian followed. The question before the Supreme Court was whether title to blocked assets, which were subject to the licensing provisions, could be transferred by judicial order without a license having been asked for or obtained. Affirming a judgment in favor

of the Alien Property Custodian, the Court held that an unlicensed transaction, being in violation of the freezing order, could be given no legal effect.

■■ That decision is controlling here. Under it NYK is in no position to assert legal or equitable title to funds which resulted from transactions that were unlicensed as to the bankrupt and this Court can give no judicial recognition to its claim. It follows, therefore, that the Court can give no judicial recognition to the claim of plaintiff trustee in bankruptcy, which is based on the theory of NYK's beneficial ownership of the funds.

In accordance with the foregoing, therefore, it is by the Court

Ordered that there be entered herein, upon findings of fact and conclusions of law, judgment in favor of the defendants and plaintiff in intervention and against the plaintiff and that said defendants and plaintiff in intervention recover their costs of suit.