**HARRY J. COMAN, Plaintiff**

v.

**SYLVIA R. COMAN, Defendant**

Civil No. 326-1969

District Court of the Virgin Islands

Div. of St. Croix

March 29, 1973

NICHOLS & SILVERLIGHT, ESQS. (ATTORNEY IRWIN J. SILVERLIGHT of counsel), Christiansted, St. Croix, V.I., *for plaintiff*

GRUNERT, STOUT, HYMES & MAYER, ESQS. (ATTORNEY RICHARD E. GRUNERT of counsel), St. Thomas, V.I., *for defendant*

CHRISTIAN, *Chief Judge*

### MEMORANDUM OPINION

On March 9, 1971, the Court ordered that the parties in this suit be each granted a decree of divorce absolute on the ground of incompatibility of temperament. Incidental questions of property settlement, alimony and support were reserved for the further order of the Court. On June 24, 1971, a supplemental hearing on the matters reserved was held. It is with these issues that this Memorandum deals.

Defendant has asked the Court to award custody of the minor children to her, to award her lump sum alimony in

the amount of $300,000, child support in the amount of $1,000 per month, with a retroactive award of $500 per month to June 19, 1969, and compensation for her share of the parties' furnishings sold by Plaintiff when he vacated the marital home. Additionally, she asks attorney's fees in the amount of $50,000.

Plaintiff, Harry Coman, has opposed all of these requests except for custody of the children, and has insisted that he is incapable of contributing any sum whatsoever to the support of his wife or children. He has requested that defendant contribute some regular sums toward his support, citing his own financial circumstances which he described as extremely poor, and her regular income which he considers more than adequate.

The chasm which divides the litigants in their prayers for relief is the significance of certain assets, primarily securities, held in the names of Rebecca Knapp, plaintiff's sister, Morris Cohen, his brother, and the children of the parties, Stacie and Sari (or in plaintiff's name on their behalf). As to the extensive holdings in the names of Knapp and Cohen, Mrs. Coman charges that they are in actuality the property of her husband, who has always managed, possessed, and received the dividends from these shares to the total exclusion of the record title-holders. The evidence adduced tends to bear her out in this respect. Plaintiff, on the other hand, denies ownership, characterizing himself as a mere representative or manager for his siblings, entirely without beneficial interest in such securities. As to the children's trust assets, originally consisting of securities, but recently transferred to real estate and possibly to other unknown investments, plaintiff concedes their equitable ownership but strongly contends that the value involved is well below the figure defendant urges. Furthermore, he suggests that the present real estate investments are as yet non-income produc-

478

ing, prohibiting any contribution to the children's support from this source.[1]

 Turning first to the securities in the name of Knapp and Cohen, the general rule is that record title to personal property raises a legal presumption of ownership, but, much like possession and other indices of ownership, the presumption created is rebuttable, 73 C.J.S. Property § 19, p. 216. The strength of the presumption varies with the surrounding circumstances. As one court explained, speaking of real rather than personal property but relevant nonetheless to this inquiry:

> Real estate is presumed to be owned by the person in whose name the record title stands, and such presumption is strengthened by the number of years the record title has remained the same, and by the record titleholder continuing in the exclusive possession and control and management thereof as the apparently exclusive owner. Ward v. Ward, 172 P.2d 978, 980 (Okla. 1946).

Expanding on this premise, it is reasonable to conclude that the legal presumption is relatively weaker where the record titleholder has enjoyed no such dominion over the property, and upon this basis, a very real question presents itself as to the "ownership" of the stock in issue. Moreover, under applicable New York law, which must govern with respect to property acquired in that jurisdiction, Restatement of Conflicts, Second § 290, where one person took title to property and the purchase price was paid by another, a resulting trust arose in favor of the purchaser unless a contrary intention was evident. (New York Estates, Powers and Trusts Law, § 7–13 abolished such trusts effective September 1, 1967). Because retroactive

---

[1] The assets held for the children, whatever they may consist of and wherever they may be situated, are the subject of civil litigation in another jurisdiction, wherein the children reside, allowing that court to appoint a guardian for them should that prove necessary, (39 Am.Jur.2d Guardian & Ward § 26, and cases cited) and generally permitting the most complete and advantageous judicial determination of the entire controversy. The court will not, for that reason, address the question of custody of those assets.

application is not to be imputed to statutes absent a clearly expressed intent that such be given, Herman Schwabe, Inc. v. United Shoe Machinery Corp., 274 F.2d 608 [2nd Cir. 1960], cert. den. 363 U.S. 811, and for the further reason that statutory action in derogation of the common law is never to be assumed, Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U.S. 426 (1907), I must conclude that as to assets acquired prior to the date of the above-cited legislation, the common law doctrine of resulting trust is applicable, Restatement of Trusts, Second § 440.[2] I also find it reasonable to infer that, because plaintiff was disbarred in May, 1967 (Tran. Vol. I p. 16), any funds he may have invested in the securities here in issue would have predated the change in New York law, and I will proceed on that assumption.

 A possible further objection to any decision by this Court on the issue of ownership of the securities held in the names of Knapp and Cohen has been articulated by defendant in her brief, to assist the Court in rendering a proper verdict, as the plaintiff elected not to treat the question in his argument to the Court. That issue revolves around the absence of Knapp and Cohen from this Court's jurisdiction and failure to make them parties, denying them an opportunity, should they desire it, to defend their title. It is clear that any decision by this Court on the ownership of these securities would not be res judicata as to the non-parties, Luther v. Kinion, 202 S.W. 589 (Mo. 1918); cf. Hardy v. Bankers Life & Casualty Co., 232 F.2d 205 (7 Cir. 1956), cert. den. 351 U.S. 984. Such a decision, however, would be binding as between these parties, and considering the burdensome history of the litigation be-

---

[2] This conclusion is bolstered by the fact that the New York legislature elected to prescribe the effective date of the statute, a date somewhat subsequent to the date of passage.

tween them concerning this question,[3] I am convinced that justice as well as judicial economy will best be served by a prompt decision, particularly because the issue has been so thoroughly litigated by both parties in this forum, which plaintiff himself elected to enter.

■ The crucial question as to ownership of the Knapp-Cohen stock is the source of purchase money, for by definition, the doctrine of resulting trust requires a preliminary determination of that question, Restatement of Trusts, Second § 440. The burden of proof rests upon the party seeking to establish the trust, in this instance, Mrs. Coman. Should payment by Mr. Coman be established, a presumption comes into operation, that a trust exists, which he would have to rebut in order to prevent imposition of a trust, Bogart, Trusts and Trustees, Second Edition, § 454, p. 522, and cases collected at n. 53, 54.

■ The initial burden, as imposed by most courts, is heavier, however, than a preponderance of the evidence. The majority appears to call for "clear and convincing evidence", Carr v. Yokohama Specie Bank, Ltd. of San Francisco, 99 F.Supp. 4, affd. 200 F.2d 251 (9 Cir. 1951), U.S. v. Schroeder, 242 F.Supp. 430, affd. 348 F.2d 223 (8 Cir. 1965); although there is respectable authority to the contrary, Stricker v. Morgan, 158 F.Supp. 830, affd. 268 F.2d 882 (5 Cir.), cert. den. 361 U.S. 963 (1960); MacKenzie v. Fritzinger, 370 Mich. 284, 121 N.W.2d 410 (1963). After review of both lines of authority, I conclude that the majority rule should apply in the Virgin Islands, Title 1 V.I.C. § 4. The test, as more fully explained in the case law, sets a middle ground between the customary civil rule—preponderance of the evidence—and the criminal rule—beyond a reasonable doubt. "Clear and convincing" evidence is that measure of proof which will produce in

---

[3] Sylvia R. Coman v. Harry J. Coman (D.C.V.I.) Civ. No. 267-1971, voluntarily dismissed; Sylvia R. Coman v. Rebecca Knapp and Morris Cohen and Arkay Props., Inc. (D.C.E.D.N.Y.) 71 Civ. 1192-JM.

the court or jury a firm belief or conviction concerning the issue in question, and it is not synonymous with clear and unequivocal proof, Hobson v. Eaton, (6 Cir. 1968) 399 F.2d 781, 784. Applying the above-stated rule to the evidence presented in this cause, I am fully satisfied that defendant has adequately established her husband as the beneficial owner of the securities in question. I shall outline below, the evidence which impels me to this conclusion. That evidence, though wholly circumstantial, is, when viewed in its entirety, more than sufficient to satisfy a reasonable mind.

Plaintiff explained that all stocks in the names of Knapp and Cohen were derived in one of two ways: by gift from their parents or by purchase from reinvested dividends from the original gift shares. As to the securities owned by the parents, however, there arises the same question of source—that is, those original securities may also have been purchased by Mr. Coman and registered in his parents' names. This possibility surfaces because of the apparent absence of income to the older couple with which they could have purchased any large number of stocks. Coman testified that although his father immigrated to the United States with few assets, he earned substantial sums in his bed spring business and that he invested these profits in stocks (Tr. Vol. II, p. 103). Plaintiff further testified that the majority of stock in his siblings' names came from his parents (Vol. I, p. 90); that although stocks were transferred to Mr. Cohen's name as early as the 1940's, Cohen never knew about these because Coman never told him (II, p. 107); and that his brother Joseph "handled everything for him" because of Cohen's mental and emotional incapacity. But as concerns the family business—the box spring factory—which allegedly spawned the wealth we now investigate, Joseph, the managing brother who had been working in the business since

"around 1932", stated at deposition that the bed-spring effort "went out of business", followed by an unsuccessful endeavor to manufacture wrought iron and most recently culminating in the present enterprise which makes convertible sofas (deposition, May 24, 1971, p. 7). This business is operated by Joseph, Morris Cohen and one employee. He (Joseph) further testified that he received nothing from his mother's estate and believed she left no will, which is inconsistent with the legal disposition of an estate of any substance, since he would be a known legal heir (dep. p. 14). As to his father's estate, Joseph testified that he and Morris Cohen received the proceeds of a $2,000 life insurance policy, which they divided, and nothing more.

As to inter vivos gifts, it is significant to note that both the Uniform Commercial Code presently in effect in New York (§ 8–308) and the Uniform Stock Transfer Act (§§ 8–301, 302, 309) which previously applied in that jurisdiction, require both indorsement and delivery of a stock certificate to effectuate transfer, although Coman stated Morris Cohen was never made aware of the securities. Further, in the face of Coman's testimony that his brother Joseph "handled everything" for Morris, Joseph testified he knew of no stock dealings on Morris' part beyond one unsuccessful effort to follow a neighbor's "tip" (deposition, p. 12).

Rebecca Knapp testified in her deposition that she had no knowledge as to what she may have inherited from either parent, and she particularly indicated that she knew nothing of any stocks in her father's estate (deposition, February 16, 1971, p. 16). She was aware of stocks held in her name which were in Coman's custody but she testified she had never had any such certificates in her own possession (deposition p. 25).

Directing attention to the securities in the hands of Cohen and Knapp (aside from the inter vivos gifts which Coman described, but which neither of the beneficiaries could corroborate) the possible sources are minimal. I have already made reference to the total absence of evidence that either parent left an estate of any consequence, and the sole asset which was identified, a home valued at approximately $40,000, was liquidated and poured into a residence which Coman purchased and occupied as the marital abode until the parties' recent separation (TR. Vol. I, p. 99). Morris Cohen's personal income approximates $5,200 per annum (Morris Cohen, answers to interrogatories #6) which is used for living expenses. Mrs. Knapp is not employed outside her home, and relies for income upon the husband's employment, which earnings have never been invested in securities according to his deposition (February 16, 1971, p. 4). On these facts, I deem it more than reasonable to conclude that Rebecca Knapp and Morris Cohen had no sources from which they could have accumulated the securities valued at hundreds of thousands of dollars.

Harry Coman, per contra, had obvious sources for such investment monies by reason of his extended practice of law. The amounts which he was capable of accumulating are clearly visible in the portfolio which he built for his children, exceeding $500,000 at the time they were liquidated. It is not irrelevant to record that he was disbarred in 1967 for charges involving improprieties in accounting for client's funds, and for commingling such funds with his own (Tr. Vol. I, p. 45–8). In any event, plaintiff's resources were infinitely more consonant with vast stock market investments than were those of his immediate family in whose names the stocks stand. Moreover, Coman was the exclusive beneficiary of these assets, with unencumbered authority to buy, sell and possess the securi-

ties, to draw and use the dividends for personal purposes, and with the correspondent felt obligation to declare such income for federal tax purposes. Specifically, the evidence established that he had sole possession of the stock certificates for both Knapp and Cohen, that he transacted all sales and purchases, and collected all proceeds, including both income from sales and from dividends. When he purchased his home, for example, Coman took a bank mortgage for part of the purchase price, but soon after he repaid the mortgage with funds from his brother's stock account, which he described as a "loan" (Vol. I, p. 101). Knapp and Cohen never received any income whatsoever from the securities over the thirty-odd years Coman testified stock transfers to one or the other were made. He further admitted reporting the dividend income from the securities in 1968 and 1969 on his federal tax return, but he insisted these sums were loans to him from Knapp and Cohen, which he reported only on his accountant's advice. His accountant, however, denied that he would ever have so advised a client (deposition, p. 85, May 25, 1971). In short, he exhibited every incident of ownership which the law recognizes over the securities, except paper title, 42 A.J. §§ 40, 41. In this respect, Knapp and Cohen were totally ignorant of the securities, in what they consisted, their number or value, and, as I have already indicated, neither received any income from them. It appears that at least Mrs. Knapp never reported any income from the securities on her income tax filings (deposition of Abraham Knapp, p. 7). Although neither Knapp or Cohen received any income from their vast stock holdings, their need for such income, if they were in fact entitled to it, was at all times readily apparent. Morris Cohen, mentally ill and seriously handicapped, is cared for by his brother Joseph, who pays all his rent, telephone and electric bills, and each brother takes $100 weekly out of the business in addition

485

(dep. p. 21). Rebecca Knapp stated at her deposition that her husband was "a very sick man". She also testified that they had moved to a new home during 1969, which they were purchasing jointly with their daughter and son-in-law, for a total price of $46,000. These circumstances would indicate that both Coman's brother and sister could have used additional income from the securities to make their lives comfortable. Yet, no such income was ever made available to either of them by Coman.

As evidence of the facility with which plaintiff could organize assets in the names of family members, I note that he accumulated over $500,000 worth of securities in the names of his daughters, with himself as trustee. This arrangement closely parallels the alleged trust status of the Knapp-Cohen shares. Moreover, when plaintiff entertained the fear that he might not survive a serious operation, he temporarily transferred the children's stocks to his siblings, as custodians, and upon recovery, he transferred them back with alacrity. Still another example of his experience in this regard appears in the transaction involving the marital home, purchased with the proceeds from the sale of his mother's home, a transaction characterized by him, once again, as a "loan". But record title to the house evidently passed from him to a corporation which he formed, the shares of which were held in trust for his children, and later transferred to his brother and sister individually (Vol. I, p. 100).

I also rely in this judgment on the demeanor and overall lack of credibility of Mr. Coman, in no way made more convincing by the deposition of Mrs. Knapp. His testimony consisted almost completely of an absence of knowledge, memory and information. His response to critical questions, interspersed from time to time with feigned seizures of some sort, almost without exception, was "I don't know"; "I don't recall"; "I don't recollect" (Vol. I, p. 100). Indeed

his failure of recollection concerning important information was so pronounced and conspicuous that he apparently felt moved to offer an explanation: i.e. his 1966 heart surgery had impaired his memory. He offered no medical testimony in support of this supposition, and I extend it scant validity. As I have suggested, Mrs. Knapp's testimony at deposition was similarly evasive and equivocal. In retrospect, I find plaintiff's evidence as to these securities, and other critical issues, totally lacking in candor and credibility, and at points self-contradictory. I, therefore, accord it minimal weight.

Upon the foregoing analysis, I find that plaintiff is the beneficial owner of the securities held under the names of Rebecca Knapp and Morris Cohen, a finding which does not, of course, bind them, but upon which I feel justified in proceeding for purposes of fixing alimony and child support.

 In the Virgin Islands, the standard for awarding alimony is well established. As formulated by the Third Circuit, Burch v. Burch, 195 F.2d 799 (1952):

Whether an award of alimony shall be made, as well as the amount to be awarded, is within the discretion of the court, having regard to the conduct of both parties, the amount of property of each, and all the other circumstances of the case.

The Court has also stated that,

The right to alimony, however, is not founded on conceptions such as those underlying the community property interests of husband and wife. The test in an application for alimony is not whether the wife has helped the husband to attain his existing financial status . . . . It is the circumstances surrounding the parties, the wife's necessities, and the husband's financial ability, the physical condition of the parties, the nature of their life together, and in these modern times, the wife's independence and ability to earn her own way, which must all be considered by the court in the exercise of its discretion in awarding or denying alimony. Poe v. Poe, 409 F.2d 40, 43 (3rd Cir. 1969).

487

Applying these principles to the instant case, it is fair to consider Mr. Coman's ill health and loss of profession, as well as Mrs. Coman's employment. It is also of importance that plaintiff is the owner of securities worth more than one-half million dollars, and that during the parties' married life they lived in well above average comfort. The marriage lasted some fifteen years, and was clearly one of mutual effort and mutual support. Mrs. Coman has requested lump sum alimony in the amount of $300,000. This amount, however, is calculated upon a base in which she includes those securities held in trust for the children, which I judge to be inappropriate. (Those assets will be treated briefly below.) In any event, this court has the authority to award alimony in a lump sum, 16 V.I.C. § 109(3) and such an award seems particularly in order where, as here, there is evidence that the husband may be inclined to obscure or dissipate his estate. Although some states evidently award a fixed percentage of the husband's estate (24 Am. Jur.2nd § 627), I am not persuaded that such a measure would comport with our law as reflected in the Poe and Burch cases. I note that the marital home exceeded $100,-000 in value, and the furnishings probably approached an equivalent sum, and in that connection, I do not find that Mrs. Coman's current expenditures are a fair index of her "necessities", as they do not even approximate the circumstances surrounding her married life and environment. After careful review of all the relevant factors, I find that $200,000 is a reasonable and proper sum for alimony. It represents less than half the resources of all description amassed during the marriage, with defendant's help, in and out of the home, all of which either remains with plaintiff or has been expended by him solely, and that amount will be the award of this Court.

██ In determining a proper contribution toward the support of the minor children, Sari, now 15 years of age,

and Stacie, age 12, I have already indicated that I will not consider the question of the securities in their names. However, it is appropriate, in my judgment, to fix the contribution to be made by plaintiff, because the trust assets are at this time non-income producing according to Mr. Coman's testimony. Defendant has requested $1,000 per month for the children henceforth, and $500 per month as a retroactive award from June 19, 1969 to the present. As to the latter request, I decline to make any award, being of the opinion that it would be improper to do so, since no sum now allowed could retroactively finance private education, riding lessons, or any of the lost opportunities which defendant now seeks for the children, and for the further reason that I entertain serious doubts as to defendant's conduct in at least obstructing Mr. Coman's access to the children during that period.

In determining the amount of child support, the important factors are the needs of the child and the financial condition of the contributing parent. In making this determination the Court may consider the standard of living which the children would have enjoyed had the family remained intact, Sigesmund v. Sigesmund, 252 P.2d 713 (Cal. 1953); Williams v. Williams, 134 S.E.2d 227 (N.C. 1964). "In addition to the actual needs of the child, a father has a legal duty to give his child those advantages which are reasonable considering his financial condition and his position in society", 24 Am.Jur.2d § 839, Divorce and Separation, p. 952. Mrs. Coman testified that the children attended private school prior to the parties' separation, at a cost of $1,300 yearly for the elder child, and $800 for the younger. She also testified they were accustomed to traveling with their parents, wore expensive clothing, and enjoyed horseback riding and piano lessons. They now attend public school and apparently live without riding and music lessons. It is safe to assume, both chil-

dren being older than they were when they last attended private school, that their present tuition would exceed the past fees, and I will adopt what I consider a fairly conservative estimate of $3,000 yearly for both children as a working figure in estimating their total financial needs. In addition to that annual expense, I believe $200 per month for each child would adequately finance the advantages and comforts to which they were treated during their parents marriage. That shall constitute the Court's award for child support, subject, of course, to reconsideration should the decision in the pending action in Kentucky materially change the premises upon which the award is founded.

Mrs. Coman has also requested an award to compensate her for a portion of the furnishings of the marital home, which Mr. Coman sold sometime after her departure. No such award will be made, however, as I conclude based on the evidence offered that he was justified in assuming she had abandoned the home with no intent to return or to claim the contents thereof, and he cannot now be held responsible for failing to preserve property indefinitely in her absence.

Finally, there is a prayer for attorneys' fees in the amount of $50,000 and for travel expenses and costs for Mrs. Coman. Payment of attorneys' fees is authorized in divorce by Title 16 V.I.C. § 108(1) prior to the entry of judgment, and in general by 5 V.I.C. § 541(b). In this instance, discovery was necessarily extensive and I will allow $15,000 as compensation therefor. Costs shall also be allowed.

Judgment shall enter in accord with the view herein expressed.