# Presidential Authority to Settle the Iranian Crisis

The President has the constitutional and statutory authority to enter an executive agreement with Iran which settles American citizens' claims against Iran; claimants who receive less than the stated value of their claims should not be able to recover additional compensation from the United States government on the theory that the settlement constituted a taking under the Fifth Amendment.

The President may, through orders issued under the International Emergency Economic Powers Act (IEEPA), free currently blocked Iranian assets and effect their return to Iran, notwithstanding the existence of court orders of attachment for bidding the removal of Iranian funds from the banks holding them, by revoking the existing general license for the attachments under the Iranian Assets Control Regulations and licensing Iranian withdrawals from the blocked accounts. Since private banks may refuse to honor withdrawal licenses after the attachments are revoked for fear of liability under state law to the attachment claimants, funds held by federal banking entities should be relied on as the source of any amounts promised to be returned forthwith to Iran.

Foreign branches of American banks are subject to orders issued under authority of the IEEPA and, once withdrawal licenses are issued, there should be no legal impediment to Iranian withdrawals from previously blocked accounts as long as previously licensed setoffs are observed. If creditors of Iran seek to attach these accounts through actions in foreign courts, it is likely that those courts would allow their own domestic claimants a special priority.

The President may, under existing law, take several kinds of actions to assist Iran in effecting the return of the former Shah's assets in the United States. These actions include blocking the assets under the IEEPA to facilitate a census and prevent their removal, undertaking to aid Iran in its litigation to recover the assets, informing the court of our position on foreign sovereign immunity and act of state doctrines, or taking an assignment of its claims from Iran. However, vesting the Shah's assets in the government would require new legislative authority and even then would give rise to a takings claim for just compensation by the Shah's estate.

September 16, 1980

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds to your request for our views concerning the President's power to settle the current crisis with Iran without the enactment of additional legislation. We believe that the President has the constitutional and statutory power necessary to enter an agreement with Iran settling the principal issues now outstanding, and to implement that agreement in an effective fashion. In particular, we conclude as follows. First, the President has the constitutional and statutory power to enter an executive agreement with Iran that settles American citizens' claims and returns some blocked funds to Iran. Second, to implement such an agreement, the President may, under the Interna-

tional Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.* (Supp. I 1977), license Iran to withdraw blocked funds, although the President would first have to revoke existing licenses for attachments against those funds. Federal entities and private banks in the United States could then safely permit withdrawals by Iran, although the private banks may perceive sufficient risk of liability to disappointed lien claimants to refuse to recognize the validity of licenses for withdrawals. Third, once withdrawals are licensed there will be no impediment to Iranian withdrawals from foreign branches of American banks, at least if previously licensed setoffs by those banks are left undisturbed. Fourth, a settlement agreement may provide for the United States to aid Iran in recovering the Shah's assets in the current litigation in New York state court, although an immediate return of those assets would not be possible. Finally, all these arrangements can be structured in a way that makes successful takings claims unlikely.

## I. Settlement of American Claims Against Iran by Executive Agreement

### A. Presidential Power

The authority of the President to enter executive agreements with other nations in order to settle claims has been explicitly upheld by the Supreme Court. *United States* v. *Belmont,* 301 U.S. 324, 330–31 (1937); *United States* v. *Pink,* 315 U.S. 203 (1942) ("That the President's control of foreign relations includes the settlement of claims is indisputable." Frankfurter, J., concurring, 315 U.S. at 240); *see also* Restatement (Second) of Foreign Relations Law § 213 (1965). *Belmont* and *Pink* upheld the Litvinov Assignment, by which outstanding Soviet claims were assigned to the United States by a simple exchange of letters between the President and the Soviet Foreign Minister. Both cases emphasized the Executive's exclusive constitutional power to recognize foreign governments and to normalize diplomatic relations with them, and viewed claims settlements as necessary incidents of the Executive's foreign relations power. *See generally United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304 (1936).

Although the President's constitutional powers almost certainly suffice to authorize an executive agreement with Iran that would take an assignment of some blocked assets and return others, support may be drawn as well from the President's statutory power under IEEPA. That statute, which authorizes the current blocking of Iranian assets, was drafted in explicit recognition that the blocking of assets could have as a primary purpose their preservation for later claims settlement. H.R. Rep. No. 459, 95th Cong., 1st Sess. 17 (1977); S. Rep. No. 466, 95th Cong., 1st Sess. 6 (1977). Thus, IEEPA's § 1706(a)(1) authorizes the continuation of controls after the underlying emergency has ended, where "necessary on account of claims involving such country or its

nationals." The need to provide a means for orderly termination of a blocking of assets once the emergency has passed implies presidential power to resolve the plethora of claims that will invariably arise.

Historical practice reflects the existence of presidential power to settle claims. While claims settlements have often been concluded by treaty or convention, historical examples abound of settlements through executive agreement. Numerous lump-sum agreements have settled claims of American nationals against foreign nations. *See, e.g.,* Claims Settlement Agreement, July 16, 1960, United States-Poland, 11 U.S.T. 1953, T.I.A.S. No. 4545; Claims Settlement Agreement, July 19, 1948, United States-Yugoslavia, 62 Stat. 2658, T.I.A.S. No. 1803. History also provides numerous examples of claims settlements through executive agreements that establish international arbitrations rather than provide a lump sum. *See generally* W. McClure, International Executive Agreements 52–56 (1941). In 1935, a congressional study identified 40 arbitration agreements entered into by the Executive between 1842 and 1931 which were not submitted to the Senate for advice and consent. 79 Cong. Rec. 969–971 (1935).[1]

## B. Constitutional Takings Claims

A question that has not been clearly settled is whether any right of action exists for claimants who allege that a settlement provides them with less than what they consider to be the real value of their claims. Agreements have traditionally provided significantly less than the amounts claimed.

The principle of international law that a sovereign may settle debts of nationals has a corollary—a national has no legal claim to any particular funds received in a claims settlement that extinguishes his claim. *See Boynton* v. *Blaine,* 139 U.S. 306 (1891); *Williams* v. *Heard,* 140 U.S. 529, 537 (1891). The Supreme Court has held that even payments received "on behalf of " an American claimant do not legally belong to him, and that the Executive Branch could refuse to remit payments received from a foreign government (allegedly because it suspected the claimants of fraud). *La Abra Silver Mining Co.* v. *United States,* 175 U.S. 423 (1899). This supports the generally held view that an American has no recourse against his government's settlement, except to petition Congress for relief. *See* Christensen, *The United States-Rumanian Claims Settlement Agreement of March 30, 1960,* 55 Am. J. Int'l L. 617, 625 (1951). No case has been found adjudicating the right to such compensation.

---

[1] We perceive no reason to believe that passage of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.,* was in any way intended to limit the established constitutional power of the President to settle claims, or in any way to alter the substantive law of liability. 1975 State Dept. Digest of U.S. Practice in Int'l Law 353.

Dissatisfied claimants have, nevertheless, raised the issue in connection with previous settlements, *see International Claims Settlement Act, Hearings on H.R. 9063 Before the Subcommittee on Europe of the House Committee on Foreign Affairs,* 90th Cong., 1st Sess. 50–55 (1967); *International Claims Settlement Act, Hearings on S. 1935 and S. 2064 Before the Subcommittee on Europe of the House Committee on Foreign Affairs,* 89th Cong., 2d Sess. 42, 48–49, 74–77 (1966). Scholars in the field have recognized the argument without necessarily endorsing it. Henkin, Foreign Affairs and the Constitution, 262–66 (1972); Oliver, *Executive Agreements and Emanations from the Fifth Amendment,* 49 Am. J. Int'l L. 362, 364 (1955); *cf.* Restatement, *supra,* Reporters' Note to § 213; Leigh & Atkeson, *Due Process in the Emerging Foreign Relations Law of the United States,* 21 Bus. Law. 853, 870–77 (1966).

Two historic Court of Claims cases discuss the taking question. *Gray v. United States,* 21 Ct. Cl. 340 (1886), *Meade v. United States,* 2 Ct. Cl. 224 (1866), *aff'd,* 76 U.S. (9 Wall.) 691. *See generally* W. Cowles, Treaties and Constitutional Law: Property Interferences and Due Process of Law, 200–21 (1941). *Gray* concerned settlement of the French Spoliation claims of the early 1800's, relating to damage done to American vessels from 1793 until 1801 by the French navy. Negotiations between France and the United States led to an agreement: the United States agreed to release the French from all claims by American nationals and France agreed not to insist upon enforcement of the alliance between the two countries. The court opined that where the Government extinguished the American claims in order to further its foreign policy, it had taken private property for a public use and the claimants were thereby entitled to compensation. We would note that in the negotiation of 1800, "individual" claims were used against "national" claims, and the setoff was of French national claims against American individual claims. Responding to this, the court said:

> It seems to us that this "bargain" . . . falls within the intent and meaning of the Constitution, which prohibits the taking of private property for public use without just compensation. We do not say that for all purposes these claims were "property" in the ordinarily accepted and in the legal sense of the word; but they were rights which had value, a value inchoate, to be sure, and entirely dependent upon adoption and enforcement by the Government; but an actual money value capable of ascertainment the moment the Government had adopted them and promised to enforce them, as it did in August, 1793, and constantly thereafter. That the use to which the claims were put was a public use cannot admit of a doubt, for it solved the problem of strained relations with France and forever put out of existence the treaties of 1778, which

formed an insuperable obstacle to our advance in paths of
peace to the achievement of commercial greatness.

*Id.* at 393. The court's opinion was advisory; Congress had asked the
court to hear the claims and report to it. Thus, the court noted that it
was examining the "ethical," not "legal" rights of a citizen against his
government, *id.* at 406–07, although this would not change the constitu-
tional analysis.

The *Meade* case involved an effort by a citizen to obtain payment
from the United States government after settlement of claims with
Spain in 1819. After the signing of a treaty between the United States
and Spain but prior to Spain's ratification, Meade submitted a contract
claim to Spain and Spain agreed to pay a certain amount. The treaty
established a claims commission; Meade presented his claim to it with
evidence of the Spanish settlement. He was unable, however, to
produce documents requested by the Commission because they had
been sent to Spain; he received no payment. Congress subsequently
referred the claim to the Court of Claims. Three members of the court
wrote opinions. The majority held that the release and cancellation of
Meade's claim against Spain was an appropriation of private property
to public use and came within the Just Compensation Clause of the
Constitution. 2 Ct. Cl. at 275. Nevertheless, it said Meade was entitled
to no compensation because the Commission's decision not to award
compensation could not be reexamined by the Court of Claims. *Id.* at
275–76. A concurring opinion found no compensable taking since the
right of eminent domain had not been exercised. The dissent found a
compensable taking, but distinguished Meade from the general class of
claimants because he was a creditor armed with a settlement entered
into by the government of Spain rather than a claim which had not
been acknowledged by a foreign power. Thus, a majority of the court
held that a compensable taking had occurred, yet a different majority
held that Meade's heirs were entitled to no compensation from the
government. The Supreme Court affirmed, 76 U.S. (9 Wall.) 691, but
did not reach the constitutional question.

The question now arises as to what reaction the courts would have
to these opinions written many years ago. While the courts in recent
years have become increasingly sensitive to the procedural require-
ments imposed by the Due Process Clause, *e.g., Goldberg* v. *Kelly,* 397
U.S. 254 (1970), they have also recognized that extensive use of regula-
tory powers by the government is not necessarily a taking. Destruction
of a monetary claim might have serious consequences for claim holders
but may be no more serious than the economic consequences flowing
from other regulation not considered a taking. The complexity of the
modern world and the increased, almost pervasive regulation that is
found in international trade have led to the realization that losses can
arise from export controls, import controls, embargoes, and similar

government acts. Individual contracts and profits are often sacrificed for what is perceived as greater foreign policy benefits.

There is no set formula for deciding when the Due Process Clause requires that economic injuries caused by public action be compensated by the government rather than remain disproportionately concentrated on a few persons. *Penn Central Transp. Co.* v. *City of New York*, 438 U.S. 104, 124 (1978). Essentially *ad hoc* factual inquiries have been considered necessary. *Id.* When there is a physical invasion by the government a taking may more easily be found than when there is a public program adjusting benefits and burdens of economic life to promote the common good. *Id.* The mere fact that property, in this case claims, may be reduced in value does not mean that a taking has necessarily occurred. *Goldblatt* v. *Town of Hempstead*, 369 U.S. 590, 594 (1962); *cf. Miller* v. *Schoene*, 276 U.S. 272 (1928) (upheld destruction without compensation of cedar trees to protect apple orchards from rust).

The courts are also more likely to uphold government action against "taking" claims during war and emergency situations which make demands that "otherwise would be insufferable." *United States* v. *Central Eureka Mining Co.*, 357 U.S. 155, 168 (1958); *Bowles* v. *Willingham*, 321 U.S. 503, 517 (1944); *United States* v. *Caltex*, 344 U.S. 149 (1952).

Applying the kind of balancing suggested by recent cases leads to persuasive arguments against the contention that a settlement for less than value is a taking. In dealing with an international emergency, the President must be able to act quickly and without fear that the courts will intervene for any but the most compelling reasons. *Cf. Narenji* v. *Civiletti*, 617 F.2d 745 (D.C. Cir. 1979).

Because of the delicate nature of the negotiations with Iran, it is impossible for a court to review political issues and put a value on the extent to which foreign policy considerations may have prevailed over monetary ones. In addition, because of deep government involvement in the crisis, (*i.e.*, the freeze, trade controls, the World Court action) it would be difficult for individuals to demonstrate what they would have recovered absent government intervention.[2] In sum we believe that claimants who receive less than the stated value of their claims should not be able to recover additional compensation from the government on the theory that the settlement constituted a taking.

## II. Presidential Authority to Return Blocked Assets to Iran

We now consider whether the President may, through orders issued under IEEPA, free the currently blocked Iranian assets and effect their return to Iran. Although the President has broad powers under IEEPA,

---

[2]We would note that these arguments can also be viewed as separate grounds for defending a settlement apart from the taking issue.

to issue orders blocking or releasing these assets,[3] difficulties arise because the banks holding the Iranian accounts are presently subject to a variety of court orders, principally attachments and preliminary injunctions, that forbid removal of the funds.[4]

The President's action would presumably be to revoke the existing general license for the attachments and to license Iranian withdrawals from the blocked accounts. (Simply to lift the freeze would probably allow the attachments to vest, preventing removal of the funds indefinitely.) Our conclusion is that the President has ample authority under IEEPA to revoke licenses for attachments and to license withdrawals of blocked funds.

On November 14, 1979, Executive Order No. 12,170 blocked Iranian government assets and the Treasury Department issued the first of its Iranian Assets Control Regulations (IACR), which provided in part:

> Unless licensed or authorized pursuant to this part any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since the effective date there existed an interest of Iran.

31 C.F.R. § 535.203(c). And on November 19, 1979, § 535.805 was added, providing that any licenses "may be amended, modified or revoked at any time." A limited modification to the general ban on unlicensed judicial proceedings was made subsequently on November 23, 1979, with the adoption of § 535.504, which authorized judicial proceedings, but continued the ban on judgments and payments from blocked accounts. And finally, on December 18, 1979, an interpretive rule was added to clarify the permissible scope of judicial action:

> The general authorization for judicial proceedings contained in § 535.504(a) includes pre-judgment attachment. However, § 535.504(a) does not authorize payment or delivery of any blocked property to any court, marshal, sheriff, or similar entity, and any such transfer of blocked property is prohibited without a specific license. It would

---

[3] The IEEPA's principal operative provision, § 1702(a)(1), provides that the President may:

(A) investigate, regulate or prohibit—

    (i) any transactions in foreign exchange,

    (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

    (iii) the importing or exporting of currency or securities; and

(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest.

[4] For convenience, we will refer to these orders generically as attachments, since that is the nature of most of them.

not be consistent with licensing policy to issue such a license.

31 C.F.R. § 535.418. Thus, the current situation is that the great majority of attachments and similar court orders exist pursuant to Treasury's general license; there are, however, scattered instances of process that was perfected before last November 14th. We understand that these pre-blocking attachments affect only a small portion of the Iranian assets. Because these attachments have priority to the licensing program, it may not be possible to revoke them simply by amending the IACR. *See Propper v. Clark,* 337 U.S. 472 (1949). These attachments may, however, be destroyed by an exercise of the President's constitutional power to settle claims.[5]

Against this background, we turn to the effect of the major Supreme Court cases in the field. In *Zittman v. McGrath,* 341 U.S. 446 (1951) (*Zittman I*), claimants attached New York bank accounts of German banks, which had previously been frozen by executive order. After the war, the Alien Property Custodian issued orders vesting the accounts in himself, but the banks refused to release them because of the still-pending attachments. The Custodian sought a declaratory judgment that the claimants had no interest in the assets, and lost. The Supreme Court noted that after the attachments had taken effect, the government issued a ruling which it argued should be applied retroactively, designating attachments as prohibited transfers. Without deciding whether such a rule could have retroactive effect in other circumstances, the Court refused to apply it to these attachments because to do so would be inconsistent with the government's earlier position regarding attachments. Treasury had represented in similar litigation that it did not wish to interfere with court proceedings, including attachments, because it was desirable to obtain adjudications of disputed rights to assets subject to the need for a license for any transfer of them. Treasury had thus encouraged litigation to go forward to conclusion, with the reservation that the value of interests so adjudicated might range from worthless to full value, depending on whether a transfer application met the government's purposes in administering the freeze program.

The Court accordingly concluded that the Custodian had

> put himself in the shoes of the German banks. As against the German debtors, the attachments and the judgments they secure are valid under New York law, and cannot be cancelled or annulled under a Vesting Order by which the Custodian takes over only the right, title, and interest of those debtors in the accounts.

---

[5]Our preceding analysis, concluding that the President may enter agreements resulting in final settlements of the claims of American citizens, makes it clear that an incident of such a settlement would be the voiding of attachments and other inchoate interests relating to those claims. *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103 (1801).

341 U.S. at 463-64. At the same time, the Court recognized that the Custodian could take possession of the assets for administration under the Act. This disposition left the ultimate status of the state law liens for later determination.

In a companion case, *Zittman* v. *McGrath,* 341 U.S. 471 (1951) (*Zittman II*), the Court granted the Custodian possession of attached accounts, for administration under the Act. The Court distinguished *Zittman I* as involving the Custodian's attempt to assert that the freezing program "precluded attaching creditors from obtaining any interest in the blocked property good as against the debtors," whereas here only possession was sought, without prejudice to the attaching creditors' rights.

Subsequently, in *Orvis* v. *Brownell,* 345 U.S. 183 (1953), the Court considered a closely similar set of facts, but with one crucial legal difference. Again, claimants obtained attachments and judgments, valid in New York law, against previously blocked assets. This time, however, the Court interpreted a similar prohibition of "transfers" to forestall attachment from creating any rights against the Custodian. The consequence was to deny the claimants a special priority in particular property, leaving them with general debt claims, to which the state court determinations would presumably be relevant.

The present program licenses attachments and litigation, but stops short of permitting judgments. The evident purpose is to allow initial sorting out of claims and preservation of evidence in contemplation of later use in some federal distribution system, much as was the function of litigation in the *Zittman* cases and in *Orvis.* The government has so characterized it in court:

> 535.504 specifically grants a license for initiating judicial proceedings, while withholding a license for a "judgment or of any decree or order of similar or analogous effect." This distinction serves several important purposes and is vitally related to the President's (and his delegee's) purpose to protect those with lawful claims against Iran while preserving the President's flexibility to adopt an approach to satisfy claims in an orderly and equitable fashion. Permitting claims to go forward permits claimants to avoid problems of statute of limitations, and may provide a vehicle for preserving critical evidence necessary to establish claims, whether they are finally resolved through subsequent licensing of judgments, resolution through an administrative claims process, or otherwise. Similarly, permitting the filing of suits puts Iran on notice of claims for which it may be held liable and thus serves to promote efforts to secure satisfactory protection of claimants' interest. At the same time withholding license

for judgments helps assure that the President maintains the flexibility to determine an orderly method of resolving legitimate claims that assures equity among claimants and provides maximum protection for creditors consistent with the President's on-going efforts to secure the hostages' release.

The approach works no unfairness on the litigants. The United States' consent to permit the litigation to go forward, expressed in the general license granted by 535.504, has always been expressly conditioned on the withholding of a license for judgments. To interpret the regulation to permit creation or extinguishing of interests in property through, *e.g.,* summary judgment on liability or on motions to dismiss with prejudice "would ignore the express conditions on which the consent was extended." *Orvis* v. *Brownell,* 345 U.S. 183, 187 (1953). *See also Propper* v. *Clark,* 337 U.S. 472, 485 (1949), where the Court recognized that the United States might permit litigation to go forward under the TWEA, while limiting the rights obtainable through litigation.

Memorandum in Support of United States Request that the Court Defer Ruling on the Pending Motions, *Charles T. Main International, Inc.,* v. *Khuzestan Water and Power Authority,* No. 79–2034C, D. Mass. Identical motions are being filed in other cases.

Thus, in the Iranian Assets Control Regulations, the government has reserved full rights to revoke the licensed attachments.[6] Although federal entities holding blocked funds can be expected to honor withdrawal licenses after the attachments are revoked, private banks may refuse to do so, fearing liability to the attachment claimants. The claimants could sue the banks for wrongfully releasing the funds, arguing that under *Zittman I,* the government is not in a position to abnegate all their state law rights against their debtors, and that under New York law, a wrongful release of attached property makes the banks liable for an accounting. *See Fitchburg Yarn Co.* v. *Wall & Co.,* 46 A.D. 2d 763, 361 N.Y.S. 2d 170 (1974). Against such an argument the exculpatory provision of IEEPA, § 1702(a)(3), appears to provide a complete defense. It provides:

Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance, and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything

---

[6] Because of the reservation of the right to revoke these attachments, it is clear that they can be revoked under IEEPA without giving rise to a successful takings claim. *See, e.g., Bridge Co.* v. *United States,* 105 U.S. 470 (1881); *United States* v. *Fuller,* 409 U.S. 488 (1973).

done or omitted in good faith in connection with the administration of or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

This provision appears to be a complete barrier to state law liability for release of blocked funds pursuant to presidential directive. Nevertheless, the presence of its predecessor does not seem to have assuaged the banks' concerns in the cases described above. Because this provision does not appear to have been litigated, firm conclusions about its scope are difficult. Moreover, there appears to be no conclusive legislative history indicating that it is meant to bar state law liabilities of all kinds. Therefore, because a presidential directive is arguably ineffectual to destroy the attachments for all purposes, the banks may not be willing to rely on it.[7] Their exposure is great; faced with a choice of disobeying a government order (which could subject them to a civil penalty of $10,000 and criminal penalties that may be unlikely in a case of unclear legalities), or releasing billions of dollars for which they may later be asked to account, the banks may insist on legislation granting them more specific protection than does the present statute before they will release the blocked funds.

Therefore, funds held by federal entities should be relied on as the source of any amounts promised to be returned forthwith to Iran, because the disposition of the Iranian funds held by private banks, at least in the United States, will surely be the subject of litigation.

### III. Funds Blocked in Foreign Branches of American Banks

The possibility that licenses will be issued for Iranian withdrawals from foreign branches of American banks raises the question of the permissible extraterritorial effect of domestic regulation. First, the United States has authority to exercise jurisdiction over its nationals abroad. *Blackmer* v. *United States,* 284 U.S. 421 (1932) (upholding contempt against U.S. citizen residing in France for failure to respond to D.C. Supreme Court subpoena); *Cook* v. *Tait,* 265 U.S. 47 (1924) (upholding tax levied against non-resident U.S. citizen for income from property located outside the United States). Although international law

---

[7] Nor do the Iranian Assets Control Regulations conclusively determine the effects of a possible revocation of the existing licenses for judicial proceedings on the rights of private parties *inter se*. Although § 535.805 provides that licenses "may be amended, modified, or revoked at any time," other ambiguous provisions suggest that private rights, if not public ones, may have accrued in the meantime. *See* § 535.203(c), which states that "unless otherwise provided," licenses render transactions enforceable "to the same extent" as they would be absent IEEPA. *See also* § 535.502(c), providing that unless otherwise specified, licenses do not create interests in property which "would not otherwise exist under ordinary principles of law," and § 535.402, stating that revocation of licenses, "unless otherwise specifically provided," do not affect the validity of prior actions. The reservation in these regulations of power to specify special conditions, however, may provide a sufficient warning to attachment lienors that their interests may be negated entirely. Revocation orders should attempt to destroy the attachments for all purposes, relying on the special conditions power.

principles are unsettled for determining the nationality of corporations, the generally accepted U.S. rule is that corporations have the nationality of the states that create them. *See* Craig, *Application of the Trading with the Enemy Act to Foreign Corporations Owned by Americans: Reflections on Fruehauf* v. *Massardy*, 83 Harv. L. Rev. 579, 589–92 (1970).

American-owned and incorporated foreign branches of U.S. banks thus appear to be "subject to the jurisdiction of the United States," within the meaning of IEEPA. And the government has steadfastly maintained to date that the initial blocking orders applied to Iranian funds in these banks. As the Supreme Court has stated in a related context, such a branch bank:

> is not a separate entity in the sense that it is insulated from [its head office's] managerial prerogatives. [The New York head office] has actual, practical control over its branches; it is organized under a federal statute, 12 U.S.C. § 24, which authorizes it "To sue and be sued, complain and defend, in any court of law and equity, as fully as natural persons"—as one entity, not branch by branch. The branch bank's affairs are, therefore, as much within the reach of the *in personam* order entered by the District Court as are those of the head office.

*United States* v. *First National City Bank [Citibank]*, 379 U.S. 378, 384 (1965). In the *Citibank* case, the Supreme Court upheld the district court's authority, in a suit by the United States to enforce a tax lien against a Uruguayan corporation, to issue a preliminary injunction against the head office of Citibank ordering it not to transfer to the corporation any corporate assets on deposit with the Montevideo branch of Citibank. The same result would follow under judicial decisions enforcing subpoenas against U.S. banks for the production of records in the hands of foreign branches. *United States* v. *First National City Bank*, 396 F.2d 897 (2d Cir. 1968); *First National City Bank of New York* v. *Internal Revenue Service*, 271 F.2d 616 (2d Cir. 1959).

Thus under domestic law IEEPA orders are effective with respect to foreign branches of American banks. These banks have already been licensed to set off amounts owed them by Iran against these accounts. Once withdrawal licenses are issued, there should be no legal impediment to Iranian withdrawal of the remaining balances of the accounts.[8]

---

[8] It is possible that after withdrawal licenses are issued, creditors of Iran will attempt to attach some of these accounts through actions in foreign courts. Such an eventuality could raise jurisdictional conflicts. In an analogous context, the United States Supreme Court has assented to an executive policy of denying foreign claimants resort to formerly blocked assets, at least unless their claims related to transactions in this country. *United States* v. *Pink, supra.* International law principles of comity suggest that foreign courts would therefore allow their own domestic claimants a special priority in adjudicating rights to Iranian funds found there.

259

## IV. Returning the Shah's Assets to Iran

We now consider what action the President may take to assist or effect the return of the Shah's assets in the United States to Iran. Such an action might take one of a number of forms: vesting the assets in the government for administration in accordance with an international settlement; blocking the assets under IEEPA to facilitate a census and to prevent their removal; or undertaking to aid Iran in its present litigation to recover the assets, either by informing the court of our position on sovereign immunity and act of state doctrines, or by taking an assignment of the claim from Iran. We conclude that the first of these alternatives, vesting the assets, would require legislation and even then would give rise to a takings claim for just compensation. The others can be performed under present law, are likely to achieve the government's purposes, and would, we believe, be likely to survive constitutional challenge by the Shah's estate.

The question of vesting authority presents special problems. When the IEEPA was enacted in 1977, the President's authority to vest assets was confined to wartime. 50 U.S.C. App. § 5(b) (Supp. I 1977). New legislation could attempt to authorize the President to vest the Shah's assets and to administer them in accordance with settlement of the hostage crisis. However, vesting the private property of a non-enemy alien national without compensation would appear to violate the Fifth Amendment. [9] In *Russian Volunteer Fleet* v. *United States,* 282 U.S. 481 (1931), the Supreme Court unanimously construed a statute to permit suits by non-enemy aliens for the value of ship construction contracts that the United States requisitioned under the statute (which provided for just compensation suits in cases of expropriation, but did not specify who would be entitled to sue). The petitioner, a Russian corporation, was the assignee of two construction contracts that were requisitioned, along with the ships built under them. The Government argued that Congress did not intend to protect corporations organized under the laws of a government that the United States did not recognize. The Court declined to adopt that statutory construction on the ground that such a construction would "raise a grave question as to the constitutional validity of the Act," (282 U.S. at 492), and instead held that:

> The petitioner was an alien friend, and as such was entitled to the protection of the Fifth Amendment of the Federal Constitution. Exerting by its authorized agent the power of eminent domain in taking the petitioner's property, the United States became bound to pay just compensation. And this obligation was to pay to the petitioner

---

[9] A foreign nation, however, unlike a foreign national, does not have rights under the Fifth Amendment.

the equivalent of the full value of the property contemporaneously with the taking.

282 U.S. at 489 (citations omitted).

The Supreme Court has, in subsequent cases, repeatedly indicated its continuing approval of the *Russian Volunteer Fleet* holding. *See, e.g., Guessefeldt* v. *McGrath,* 342 U.S. 308, 318 (1952). In *Clark* v. *Uebersee Finanz-Korporation,* 332 U.S. 480 (1947), the Court held that Congress' amendment of the Trading with the Enemy Act (TWEA) in 1941 to permit the seizure of any foreign asset was not intended to preclude non-enemy aliens from claiming their interests in such assets:

> It is not easy for us to assume that Congress treated all non-enemy nations, including our recent allies, in such a harsh manner, leaving them only with such remedy as they might have under the Fifth Amendment.

332 U.S. at 487–8. *See also Becker Steel Co.* v. *Cummings,* 296 U.S. 74, 79 (1935).[10]

The President's authority to block the Shah's assets under present law, in contrast to vesting them, does not seem open to serious question. The IEEPA authorizes the President to block transfers of "any property in which any foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1). The application of this language in the predecessor TWEA to the assets of foreign nationals was firmly established by the time of the IEEPA's enactment and has repeatedly survived constitutional challenge. *E.g., Sardino, supra,* upholding the blocking of assets of Cuban nationals. Still, an executive order blocking property of the Shah's estate in the United States would be unique in singling out the assets of one individual. Nevertheless, there seems ample justification for such an order in the prominent place in the current emergency of Iran's claim that assets in the Shah's estate are actually converted Iranian government assets.

Indeed, there is an argument that the Shah's assets in this country are presently blocked by Executive Order No. 12,170. That order blocks "all property and interests in property" of the government of Iran, and implementing regulations define "interests" and "property" in the broadest possible terms, including indirect and contingent interests. 31 C.F.R. §§ 535.311-12. Therefore, perhaps the assets claimed in Iran's suit against the Shah in New York state court are subject to the blocking order. (Certainly any assets for which Iran obtained a judgment thereupon would be blocked.) However, an interpretation of the

---

[10] The only authority to the contrary is Judge Friendly's dictum in *Sardino* v. *Federal Reserve Bank of New York,* 361 F.2d 106, 113 (2d Cir. 1966), *cert. denied,* 385 U.S. 898, to the effect that the right of a state to protect its nationals abroad might comprehend expropriation of property of nationals of an offending nation for compensatory purposes. *Sardino* involved blocked assets, not vested ones; this dictum has broad and quite harsh implications. We believe it to be inconsistent with the Supreme Court cases discussed in text.

blocking order that applied it to assets claimed by Iran in litigation would grant that nation a power to block assets in this country by asserting claims to them. In view of the implications of such an interpretation, we believe that it was not intended by the order or the regulations, and that a separate executive order blocking assets owned by the Shah's estate would be necessary. The Treasury Department could then proceed to perform a census of the assets in the normal manner.

An order blocking the Shah's assets would presumably be preparatory to an effort to have the Government participate in Iran's suit against the Shah in either of two ways. First, we could simply urge the court to reach the merits of the conversion claims, by filing a Suggestion of Interest that presents the Executive's position that the doctrines of sovereign immunity and act of state should not bar the court's determination of the merits. Second, the Government could urge the court to treat the merits as foreclosed in Iran's favor, so that the only remaining issue would be to identify particular assets as belonging to the Shah's estate. We would do this by presenting a Suggestion of Interest urging that under the act of state doctrine, Iranian government determinations that the Shah did convert government assets must be respected by our courts. Indeed, we could take an assignment of the Iranian claims and pursue them before the court. We will analyze these possibilities in the order presented.

In the absence of a Suggestion of Interest of the United States that alters the court's approach to sovereign immunity and act of state doctrines, it may fail to reach the merits of Iran's case. The complaint alleges that the Shah was the *de facto* ruler and head of state of Iran from 1941 until January 1979. The acts complained of are alleged to have taken place in Iran during the period that the Shah was the ruling monarch, and therefore would ordinarily constitute acts of state.

An argument can also be made that the Shah's estate enjoys sovereign immunity from suit.[11] The 1976 Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, does not expressly address the privileges and immunities of heads of state, but talks only in terms of "foreign states." Nevertheless, Restatement (Second) of the Foreign Relations Law of the United States, § 66 (1965), states that the immunity of a foreign state recognized in § 65 extends to "its head of state and any person designated by him as a member of his official party." Thus, it is arguable that a former head of state enjoys the immunities of a "foreign state" as codified in the Act.[12] Alternatively, if the Act were construed

---

[11] In *Hatch* v. *Baez*, 14 N.Y. (7 Hun) 596 (1876), the court held that the acts while in office of a former head of state were immune from judicial scrutiny in a suit brought by a private claimant, not his former government. The court's decision is phrased in terms suggestive of both act of state and sovereign immunity doctrines.

[12] Section 1605(a)(5) preserves the immunity of foreign states from suit with respect to—

Continued

262

not to apply to heads of state, the Shah might be entitled to immunity under generally recognized doctrines of customary international law. *See* 1 Oppenheim's International Law 676 ff. (Lauterpacht ed., 1953).

Since either act of state or sovereign immunity doctrines may defeat Iran's claims against the Shah if applied in this case, it is important to consider whether the present Iranian government may waive the application of these doctrines to the acts of its predecessor. We have found no authority on point. As an *a priori* matter, it seems that Iran might be able to waive the doctrines.[13] Both doctrines exist for the benefit of the state in question, not for the individuals who lead it. Therefore it seems incongruous to apply the doctrines to defeat a claim by a state for its own assets converted by a former monarch. Since the question of the waivability of these defenses by a present government against a former head of state is an open one, a Suggestion of Interest indicating that the Executive favors reaching the merits might be especially persuasive in court, although it is unlikely to prove conclusive.[14]

A more conclusive impact on the merits might follow an Iranian decree nationalizing the Shah's assets, and either a Suggestion of Interest by the United States, urging that it be honored, or a full-scale assignment of the Iranian claims to the United States pursuant to an executive agreement. Such an assignment should allow our government to recover the assets, under *United States* v. *Belmont,* 301 U.S. 324 (1937), which held that a foreign country's expropriation decree directed at that country's corporations must be deemed by a U.S. court to have validly vested title to the expropriated assets in the foreign government. The United States sued in *Belmont* to recover funds that a Russian corporation, prior to nationalization, had deposited with a New York banker. The United States claimed these funds under the Litvinov Assignment. The Court held that our recognition of the U.S.S.R. impliedly recognized as valid that nation's expropriation decrees, and that the U.S. claim for the expropriated assets did not constitute a taking of private property under the Fifth Amendment:

> The public policy of the United States relied upon as a bar to the action is that declared by the Constitution, namely, that private property shall not be taken without

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

The tortious and wrongful acts alleged in the complaint would probably fall within the above provisions of the Act.

[13] Analogy may be taken to the pattern of diplomatic immunities and their waiver. Under the Vienna Convention on Diplomatic Relations, the sending state may waive a diplomat's immunity (art. 32). Absent waiver, however, immunity for the exercise of official functions subsists after the diplomat's appointment has terminated (art. 39.2).

[14] The effect in New York courts of Suggestions of Interest by the United States regarding these issues is discussed at length in our memorandum of January 2, 1980, to the Acting Associate Attorney General [p: 160 *supra*].

just compensation. But the answer is that our Constitution, laws and policies have no extraterritorial operation, unless in respect of our own citizens. What another country has done in the way of taking over property of its nationals, and especially of its corporations, is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled.

301 U.S. at 332 (citation omitted). No suggestion appears in *Belmont* that the constitutionality of the United States government's "taking" depended at all on the payment of compensation to Russian nationals by this government or by that of the U.S.S.R. *See also United States* v. *Pink,* 315 U.S. 203 (1942). Thus it appears that an assignment can avoid the constitutional perils of vesting—the *Russian Volunteer Fleet* case was cited with approval in *Belmont.*

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*
